[No. S054868. Nov. 2, 1998.]

KHALID IQBAL KHAWAR, Plaintiff and Respondent, v. GLOBE INTERNATIONAL, INC., Defendant and Appellant.

ALI AHMAD, Plaintiff and Appellant, v. GLOBE INTERNATIONAL, INC., Defendant and Respondent.

**COUNSEL**

Francis C. J. Pizzulli for Plaintiff and Appellant and for Plaintiff and Respondent.

Deutsch, Levy & Engel, Paul M. Levy, Glassman & Browning, Glassman, Browning & Saltsman, Anthony Michael Glassman, Barbara Tarlow, Lori A. Nielsen, Pillsbury, Madison & Sutro, Walter R. Allan, Edward P. Davis, Jr., James M. Chadwick, Joseph R. Tiffany II, David S. Winton, Caroline N. Mitchell and Amy Hogue for Defendant and Appellant and for Defendant and Respondent.

William A. Niese, Karlene W. Goller, Debra Foust Bruns, Judith Fanshaw, Susan Holliday, Beth A. Finley, Sandra Williams, Harold W. Fuson, Jr., Anne H. Egerton, Andrea Hartman, George Freeman, Adam Liptak, Ralph Goldberg, Stephen Fuzesi, Jr., Thomas W. Newton, Jane Kirtley, Bernard Zimmerman, Davis, Wright & Tremaine, Kelli L. Sager, Bruce E. H. Johnson, Debora K. Kristensen, Karen Fredricksen, Weil, Gotshal & Manges, Jonathan Bloom, Rogers & Wells, Richard N. Winfield, Reed, Smith, Shaw & McClay, J. Laurent Scharff, Baker & Hostetler, Bruce W. Sanford, Henry S. Hoberman, Robert Lystad, Steinhart & Falconer, James F. Brelsford, Roger R. Myers and Nicole A. Wong as Amici Curiae on behalf of Defendant and Appellant and Defendant and Respondent.

**OPINION**

**KENNARD, J.**—We granted review to decide certain issues concerning the federal Constitution's guarantees of freedom of speech and of the press

insofar as they restrict a state's ability to impose tort liability for the publication of defamatory falsehoods. More specifically, we address the definition of a "public figure" for purposes of tort and First Amendment law, the existence in this state of a privilege for "neutral reportage," and the showings required to support awards of compensatory and punitive damages for the republication of a defamatory falsehood.

On these issues, we conclude: (1) A young journalist who was photographed near a nationally prominent politician moments before the politician's assassination, but who was never a suspect in the government's investigation of the assassination, whose views on the assassination were never publicized, and who never sought to influence public discussion about the assassination, was not a public figure in relation to a tabloid newspaper's article reporting a book's false accusation that the journalist assassinated the politician; (2) this state does not recognize a neutral reportage privilege for republication of a libel concerning a private figure (and we need not and do not decide here whether this state recognizes a neutral reportage privilege for republication of a libel concerning a public official or public figure); and (3) the evidence produced at the trial in this case supports the jury's findings of negligence and actual malice, which in turn support the awards of compensatory and punitive damages.

## I. FACTS

In November 1988, Roundtable Publishing, Inc., (Roundtable) published a book written by Robert Morrow (Morrow) and entitled The Senator Must Die: The Murder of Robert Kennedy (the Morrow book). The Morrow book alleged that the Iranian Shah's secret police (SAVAK), working together with the Mafia, carried out the 1968 assassination of United States Senator Robert F. Kennedy (Kennedy) in California and that Kennedy's assassin was not Sirhan Sirhan, who had been convicted of Kennedy's murder (see *People v. Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121]), but a man named Ali Ahmand, whom the Morrow book described as a young Pakistani who, on the evening of the Kennedy assassination, wore a gold-colored sweater and carried what appeared to be a camera but was actually the gun with which Ahmand killed Kennedy. The Morrow book contained four photographs of a young man the book identified as Ali Ahmand standing in a group of people around Kennedy at the Ambassador Hotel in Los Angeles shortly before Kennedy was assassinated.

Globe International, Inc., (Globe) publishes a weekly tabloid newspaper called Globe. Its issue of April 4, 1989, contained an article on page 9 under the headline: *Former CIA Agent Claims: IRANIANS KILLED BOBBY KENNEDY FOR*

*THE MAFIA* (the Globe article). Another headline, appearing on the front page of the same issue, stated: *Iranian secret police killed Bobby Kennedy*. The Globe article, written by John Blackburn (a freelance reporter and former Globe staff reporter), gave an abbreviated, uncritical summary of the Morrow book's allegations. The Globe article included a photograph from the Morrow book showing a group of men standing near Kennedy; Globe enlarged the image of these individuals and added an arrow pointing to one of these men and identifying him as the assassin Ali Ahmand.

In August 1989, Khalid Iqbal Khawar (Khawar) brought this action against Globe, Roundtable, and Morrow, alleging that he was the person depicted in the photographs and identified in the Morrow book as Ali Ahmand, and that the book's accusation, repeated in the Globe article, that he had assassinated Kennedy was false and defamatory and had caused him substantial injury. Three months later, Khawar's father, Ali Ahmad (not Ahmand), brought a separate defamation suit against the same defendants and based on the same publications. These two actions were consolidated.

Morrow defaulted, and Roundtable settled with both Khawar and Ahmad before trial. As part of the settlement, Roundtable executed a retraction disavowing "any and all statements, intimations, or references that Khalid Iqbal Khawar or Ali Ahmad were in any way associated with or committed the assassination of United States Senator Robert F. Kennedy." A jury trial ensued on the claims against Globe.

The evidence at trial showed that in June 1968, when Kennedy was assassinated, Khawar was a Pakistani citizen and a free-lance photojournalist working on assignment for a Pakistani periodical. At the Ambassador Hotel's Embassy Room, he stood on the podium near Kennedy so that a friend could photograph him with Kennedy, and so that he could photograph Kennedy. He was aware that television cameras and the cameras of other journalists were focused on the podium and that his image would be publicized. When Kennedy left the Embassy Room, Khawar did not follow him; Khawar was still in the Embassy Room when Kennedy was shot in the hotel pantry area. Both the Federal Bureau of Investigation (FBI) and the Los Angeles Police Department questioned Khawar about the assassination, but neither agency ever regarded him as a suspect.

In April 1989, 21 years later, when the Globe article was published, Khawar was a naturalized United States citizen living with his wife and children in Bakersfield, California, where he owned and operated a farm. His father, Ali Ahmad, had likewise become a naturalized United States citizen and settled in Bakersfield. After Khawar read the Globe article, he became

very frightened for his own safety and that of his family. He received accusatory and threatening telephone calls about the article from as far away as Thailand, he and his children received death threats, and his home and his son's car were vandalized. A Bakersfield television station interviewed Khawar about the Globe article.

The trial court granted Globe's motion for nonsuit as to Ahmad on the ground that the allegedly defamatory statements in the Globe article were not "of and concerning" Ahmad. As to Khawar, the jury returned, among others, these special verdicts: (1) the Globe article contained statements about Khawar that were false and defamatory; (2) Globe published the article negligently and with malice or oppression; (3) with respect to Kennedy's assassination, Khawar was a private rather than a public figure; and (4) the Globe article was a neutral and accurate report of the Morrow book. The parties had previously agreed that the jury's findings on the last two issues would be advisory only. The jury awarded Khawar $100,000 for injury to his reputation, $400,000 for emotional distress, $175,000 in presumed damages, and, after a separate punitive damages phase, $500,000 in punitive damages.

After the return of these special verdicts, the trial court reviewed those that were deemed advisory and determined as a matter of law that (1) the Globe article was *not* an accurate and neutral report of the statements and charges made in the Morrow book (thus disagreeing with and rejecting the jury's advisory special verdict); and (2) with respect to the events in question, Khawar was a private and not a public figure (thus agreeing with and adopting the jury's advisory special verdict). The trial court's finding that the Globe article was not an accurate and neutral report of the Morrow book was apparently based on the court's subsidiary finding that although Khawar could be identified from the photograph of him that appeared in the Globe article, which included an arrow pointing directly at Khawar, it was impossible to identify Khawar from the smaller, darker, and less distinct image of him, without an arrow, that appeared in the Morrow book. Based upon its findings that Khawar was not named in and could not be identified from the photographs in the Morrow book, the trial court vacated Morrow's default and ultimately entered judgment in his favor. The court granted judgment on the special verdicts for Khawar and against Globe in the amount of $1,175,000.

Globe appealed from the judgment. The Court of Appeal reached these conclusions: (1) Khawar was not a public figure; (2) California has not adopted a neutral reportage privilege for private figures; (3) in light of these conclusions, it was unnecessary to decide whether California has adopted a

neutral reportage privilege for public figures or whether the Globe article was a neutral and accurate report of the Morrow book; and (4) the evidence supported the trial court's findings of negligence and actual malice. The Court of Appeal affirmed the judgment.

We granted Globe's petition for review raising these issues: (1) When a published book places a person at the center of a public controversy, is that person an involuntary public figure for the limited purpose of a media report about that book and that controversy? (2) Does the First Amendment to the federal Constitution mandate a privilege for a media defendant's publication of a neutral and accurate report about a controversial book's allegations regarding matters of public concern? (3) Does the evidence support the jury's special verdict finding of actual malice? (4) Does the evidence support the jury's special verdict finding of negligence? (5) Did the trial court usurp the jury's role and violate Globe's right to due process of law when it determined the Globe article to be an "original libel" without giving Globe the opportunity to be heard or present evidence on that issue?

## II. PUBLIC FIGURE

We consider first Globe's contention that the trial court and the Court of Appeal erred in concluding that Khawar is a private rather than a public figure for purposes of this defamation action.

### A. *Background*

The federal Constitution's First Amendment, made applicable to the states by the Fourteenth Amendment (*Near* v. *Minnesota* (1931) 283 U.S. 697, 707 [51 S.Ct. 625, 627-628, 75 L.Ed. 1357]), guarantees freedom of speech and of the press. In *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412], the United States Supreme Court for the first time construed these constitutional guarantees as imposing limitations on a state's authority to award damages for libel. Specifically, the court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.* at pp. 279-280 [84 S.Ct. at p. 726].) The court later explained that the publisher of a defamatory statement acts with reckless disregard amounting to actual malice if, at the time of publication, the publisher "in fact entertained serious doubts as to the truth of his publication." (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [88 S.Ct. 1323, 1325, 20 L.Ed.2d 262].) In *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S.

130, 134 [87 S.Ct. 1975, 1980-1981, 18 L.Ed.2d 1094], the high court held that this "actual malice" requirement for defamation actions brought by public officials applied also to defamation actions brought ·by "public figures."

In *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789] (*Gertz*), the court explained that it had imposed the actual malice requirement on defamation actions by both public officials and public figures because such persons "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy" (*id.* at p. 344 [94 S.Ct. at p. 3009]) and because they "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them" (*id.* at p. 345 [94 S.Ct. at p. 3010]). Concerning the latter justification, the court stated: "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." (*Ibid.*)

The court then explained that there are two types of public figures: "Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." (*Gertz, supra,* 418 U.S. 323, 345 [94 S.Ct. 2997, 3009].) The court reiterated the distinction in these words: "[The public figure] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." (*Id.* at p. 351 [94 S.Ct. at pp. 3012-3013].)

The court contrasted these two types of public figures—the all purpose public figure and the limited purpose public figure—with an ordinary private individual: "He [the private individual] has not accepted public office or assumed an 'influential role in ordering society.' [Citation.] He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they

are also more deserving of recovery." (*Gertz, supra,* 418 U.S. 323, 345 [94 S.Ct. 2997, 3010].) The court declined to impose the actual malice requirement on the recovery of damages for actual injury caused to a private figure by the publication of a defamatory falsehood. (*Id.* at pp. 345-348 [94 S.Ct. at pp. 3009-3011].)

In three later decisions, the United States Supreme Court has applied this form of analysis, similarly concluding in each that a plaintiff in a libel action was a private rather than a public figure. (*Wolston* v. *Reader's Digest Assn., Inc.* (1979) 443 U.S. 157, 166-169 [99 S.Ct. 2701, 2706-2708, 61 L.Ed.2d 450] (*Wolston*); *Hutchinson* v. *Proxmire* (1979) 443 U.S. 111, 133-136 [99 S.Ct. 2675, 2687-2689, 61 L.Ed.2d 411]; *Time, Inc.* v. *Firestone* (1976) 424 U.S. 448, 451-455 [96 S.Ct. 958, 963-966, 47 L.Ed.2d 154].)

B. *Analysis*

■ We begin with the standard of review. At trial, whether a plaintiff in a defamation action is a public figure is a question of law for the trial court. (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610]; *Tavoulareas* v. *Piro* (D.C. Cir. 1987) 817 F.2d 762, 772 [260 App.D.C. 39]; see Smolla, Law of Defamation (10th ed. 1996) § 2.29[2], p. 2-101.) On appeal, the trial court's resolution of disputed factual questions bearing on the public figure determination is reviewed for substantial evidence, while the trial court's resolution of the ultimate question of public figure status is subject to independent review for legal error. (See *Wolston, supra,* 443 U.S. 157, 166-168 [99 S.Ct. 2701, 2706-2707] [apparently applying these standards]; *Gertz, supra,* 418 U.S. 323, 352 [94 S.Ct. 2997, 3013] [same]; *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d 244, 255-256 [same].)

■ Applying the standard here, we note, first, that Globe does not contend that Khawar is a public figure for all purposes but merely that he is a public figure for limited purposes relating to particular public controversies. Globe's main argument appears to be that publication of the Morrow book drew Khawar into public controversies surrounding Kennedy's assassination and that Khawar is therefore an involuntary public figure for the limited purpose of a report on that book. In making this argument, Globe relies on the language in *Gertz, supra,* 418 U.S. 323, that it is possible for a person "to become a public figure through no purposeful action of his own" (*id.* at p. 345 [94 S.Ct. at p. 3009]), and that a person can become a public figure by being "drawn into a particular public controversy" (*id.* at p. 351 [94 S.Ct. at p. 3013]). Thus, Globe concedes, at least for purposes of this one argument, that Khawar did not intentionally thrust himself into the vortex of any public controversy.

We find Globe's argument unpersuasive because characterizing Khawar as an involuntary public figure would be inconsistent with the reasons that the United States Supreme Court has given for requiring public figures to prove actual malice in defamation actions. As we have explained, the high court imposed the actual malice requirement on defamation actions by public figures and public officials for two reasons: They have media access enabling them to effectively defend their reputations in the public arena; and, by injecting themselves into public controversies, they may fairly be said to have voluntarily invited comment and criticism. (*Gertz, supra,* 418 U.S. 323, 344-345 [94 S.Ct. 2997, 3009-3010].) By stating that it is theoretically possible to become a public figure without purposeful action inviting criticism (*id.* at p. 345 [94 S.Ct. at pp. 3009-3010]), the high court has indicated that purposeful activity may not be essential for public figure characterization. But the high court has never stated or implied that it would be proper for a court to characterize an individual as a public figure in the face of proof that the individual had neither engaged in purposeful activity inviting criticism nor acquired substantial media access in relation to the controversy at issue. We read the court's decisions as precluding courts from affixing the public figure label when neither of the reasons for applying that label has been demonstrated. Thus, assuming a person may ever be accurately characterized as an *involuntary* public figure, we infer from the logic of *Gertz* that the high court would reserve this characterization for an individual who, despite never having *voluntarily* engaged the public's attention in an attempt to influence the outcome of a public controversy, nonetheless has acquired such public prominence in relation to the controversy as to permit media access sufficient to effectively counter media-published defamatory statements.

We find in the record no substantial evidence that Khawar acquired sufficient media access in relation to the controversy surrounding the Kennedy assassination or the Morrow book to effectively counter the defamatory falsehoods in the Globe article. After the assassination and before publication of the Morrow book, no reporter contacted Khawar to request an interview about the assassination. Nor was there any reason for a reporter to do so: Khawar was not a suspect in the investigation, he did not testify at the trial of the perpetrator of the assassination, and, so far as the record shows, his own views about the assassination were never publicized.

Nothing in the record demonstrates that Khawar acquired any significant media access as a result of publication of either the Morrow book or the other book, RFK Must Die (1970) by Robert Blair Kaiser, in which, according to Globe, questions were raised about Khawar's activities in relation to the assassination. There is no evidence that either book enjoyed substantial

sales or was reviewed in widely circulated publications. Indeed, the evidence showed that when the Globe article appeared, Roundtable had sold only 500 of the 25,000 printed copies of the Morrow book, and that although Roundtable had sent 150 copies of the Morrow book to various media entities, only Globe published a report concerning it. Before publication of the Globe article, no reporter contacted Khawar to interview him about either book, and he remained unaware of their publication.

The interview by the Bakersfield television station, which was the only interview in which Khawar ever participated that related in any way to the Kennedy assassination, the Morrow book, or the Globe article, occurred *after and in response to* the publication of the Globe article. Although this single interview demonstrates that Khawar enjoyed some media access, it is only the media access that would likely be available to any private individual who found himself the subject of sensational and defamatory accusations in a publication with a substantial nationwide circulation. (Globe distributed more than 2.7 million copies of the issue containing the Globe article.) If such access were sufficient to support a public figure characterization, any member of the media—any newspaper, magazine, television or radio network or local station—could confer public figure status simply by publishing sensational defamatory accusations against any private individual. This the United States Supreme Court has consistently declined to permit. As the court has repeatedly said, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." (*Hutchinson* v. *Proxmire, supra,* 443 U.S. 111, 135 [99 S.Ct. 2675, 2688]; see Smolla, Law of Defamation, *supra,* § 2.10, p. 2-34; see also *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 752-753 [257 Cal.Rptr. 708, 771 P.2d 406].)

Although Globe's primary argument is that publication of the Morrow book made Khawar an involuntary public figure, Globe may be understood to argue further that Khawar's involvement with the Kennedy assassination controversies was not entirely involuntary because, immediately before the assassination, Khawar sought and obtained a position close to Kennedy on the podium knowing that there would be substantial media coverage of the event. For a variety of reasons, this conduct does not demonstrate that Khawar voluntarily elected to encounter an increased risk of injury from defamatory falsehoods in publications like the Globe article.

First, Khawar's conduct occurred before any relevant controversy arose. The controversies discussed in the Globe article related to Kennedy's assassination and the particular theory concerning it that was proposed in the Morrow book. Khawar's conduct in standing near Kennedy at the hotel was

not a voluntary association with either of those controversies because the conduct occurred before the assassination and before the Morrow book's publication. Khawar did not know, nor should he have known, that Kennedy would be assassinated moments later, much less that a book would be published 20 years thereafter containing the theory proposed in the Morrow book. We do not disagree with Globe that Kennedy's campaign for his party's nomination to the presidency may be described as a public issue or controversy, nor do we disagree that Khawar voluntarily associated himself with this public issue or controversy by allowing himself to be photographed with Kennedy at a campaign press conference. But these facts have no legal significance for purposes of this libel action. The subject of the Globe article was not Kennedy's candidacy as such, but rather Kennedy's assassination and the theory put forward in the Morrow book.

Second, even as to the public issues or controversies relating to Kennedy's candidacy, the role in these controversies that Khawar voluntarily assumed by standing near Kennedy on the podium was trivial at best. As the United States Supreme Court has stressed, "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." (*Wolston, supra,* 443 U.S. 157, 167 [99 S.Ct. 2701, 2707].) Khawar's conduct in standing near Kennedy foreseeably resulted in his being photographed with Kennedy, but a journalist who is photographed with other journalists crowded around a political candidate does not thereby assume any special prominence in relation to the political campaign issues.

Third, appearing on the podium was not conduct by which Khawar "engaged the attention of the public *in an attempt to influence* the resolution of the issues involved." (*Wolston, supra,* 443 U.S. 157, 168 [99 S.Ct. 2701, 2707], italics added.) Khawar, who was an admirer of Kennedy, wanted to be photographed with Kennedy because the resulting photographs would have a strictly personal value as souvenirs. Khawar did not anticipate, nor did he have reason to anticipate, that inclusion of his image would make the photographs more newsworthy or would in any way affect the resolution of any public issue related to Kennedy's run for the presidency. In brief, by appearing in close proximity to Kennedy, Khawar did not engage in conduct that was "calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue." (*Ibid.*)

Having concluded that Khawar did not voluntarily elect to encounter an increased risk of media defamation and that before publication of the Globe article he did not enjoy media access sufficient to prevent resulting injury to his reputation, we agree with the trial court and the Court of Appeal that, for

purposes of this defamation action, Khawar is a private rather than a public figure.

## III. NEUTRAL REPORTAGE PRIVILEGE

Globe contends that the trial court and the Court of Appeal erred in holding that the neutral reportage privilege does not apply to insulate from defamation liability its republication of the Morrow book's defamatory falsehoods.

### A. *Background*

At common law, one who republishes a defamatory statement is deemed thereby to have adopted it and so may be held liable, together with the person who originated the statement, for resulting injury to the reputation of the defamation victim. (See Rest.2d Torts, § 578.) California has adopted the common law in this regard (*Frommoethelydo* v. *Fire Ins. Exchange* (1986) 42 Cal.3d 208, 217 [228 Cal.Rptr. 160, 721 P.2d 41]; *Gilman* v. *McClatchy* (1896) 111 Cal. 606, 612 [44 P. 241]), although by statute the republication of defamatory statements is privileged in certain defined situations (see, e.g., Civ. Code, § 47).

In a 1977 decision, a federal appellate court held that, under certain circumstances, as an exception to the common law republication rule, the federal Constitution's First Amendment mandates an absolute privilege for the republication of defamatory statements. (*Edwards* v. *National Audubon Society, Inc.* (2d Cir. 1977) 556 F.2d 113, cert. den. 434 U.S. 1002 [98 S.Ct. 647, 54 L.Ed.2d 498] (*Edwards*).) This privilege has since come to be known as the neutral reportage privilege. The *Edwards* court defined the privilege this way: "[W]hen a *responsible, prominent organization* . . . makes serious charges against a *public figure,* the First Amendment protects the *accurate and disinterested reporting* of those charges, regardless of the reporter's private views regarding their validity." (556 F.2d at p. 120, italics added.)[1]

The theory underlying the privilege is that the reporting of defamatory allegations relating to an existing public controversy has significant

---

[1]The neutral reportage privilege to some extent resembles and overlaps the common law privilege of "fair report," which California has codified in Civil Code section 47, subdivisions (d) and (e) (see *Kilgore* v. *Younger* (1982) 30 Cal.3d 770, 776 [180 Cal.Rptr. 657, 640 P.2d 793]) and also the "wire service defense," which has been adopted by some courts in other jurisdictions (see *Appleby* v. *Daily Hampshire Gazette* (1985) 395 Mass. 32 [478 N.E.2d 721]; *Brown* v. *Courier Herald Pub. Co., Inc.* (S.D.Ga. 1988) 700 F.Supp. 534; *Layne* v. *Tribune Co.* (1933) 108 Fla. 177 [146 So. 234, 86 A.L.R. 466]) but has yet to be considered by any published decision of a court of this state. Globe does not argue that either the statutory fair report privilege or the wire service defense immunizes it from liability to Khawar for damages occasioned by publication of the Globe article. Accordingly, we have no occasion to consider application of Civil Code section 47 to the circumstances of this case.

informational value for the public regardless of the truth of the allegations: If the allegations are true, their reporting provides valuable information about the target of the accusation; if the allegations are false, their reporting reflects in a significant way on the character of the accuser. In either event, according to the theory, the very making of the defamatory allegations sheds valuable light on the character of the controversy (its intensity and perhaps viciousness). As we understand it, the theory also rests on a distinction between publication and republication. Applying this distinction, proponents of the neutral reportage privilege urge that the reporting of a false and defamatory accusation should be deemed neither defamatory nor false if the report accurately relates the accusation, makes it clear that the republisher does not espouse or concur in the accusation, and provides enough additional information (including, where practical, the response of the defamed person) to allow the readers to draw their own conclusions about the truth of the accusation.

The United States Supreme Court has not stated whether it agrees with this theory, and it has never held that the First Amendment mandates a neutral reportage privilege (see *Harte-Hanks Communications* v. *Connaughton* (1989) 491 U.S. 657, 660, fn. 1 [109 S.Ct. 2678, 2682, 105 L.Ed.2d 562] [declining to decide the issue]). Nor have we ever addressed the question whether the neutral reportage privilege will be recognized in this state.[2]

In other jurisdictions, some state and federal appellate courts have rejected the privilege entirely (*Dickey* v. *CBS, Inc.* (3d Cir. 1978) 583 F.2d 1221, 1225-1226; *McCall* v. *Courier-Journal & Louisville Times* (Ky. 1981) 623 S.W.2d 882; *Postill* v. *Booth Newspapers, Inc.* (1982) 118 Mich.App. 608 [325 N.W.2d 511]; *Hogan* v. *Herald Co.* (1982) 84 A.D.2d 470 [446 N.Y.S.2d 836, 842]), while courts that have adopted it have disagreed as to its elements (compare, e.g., *Martin* v. *Wilson Pub. Co.* (R.I. 1985) 497 A.2d 322, 330 [stating that privilege applies "only in the extremely limited situation in which the publication accurately attributes such statements to an

---

Also, because Globe conceded at trial that the Globe article was not a book review, we have no occasion here to consider whether republication of a defamatory statement in the context of a book review would require a different analysis or result.

[2]In some published decisions, our state Courts of Appeal have mentioned the neutral reportage privilege as a doctrine proposed or adopted in other jurisdictions (e.g., *Stockton Newspapers, Inc.* v. *Superior Court* (1988) 206 Cal.App.3d 966, 981, fn. 6 [254 Cal.Rptr. 389]) or have quoted language relating to the privilege from *Edwards, supra,* 556 F.2d 113, while deciding distinct issues (e.g., *Grillo* v. *Smith* (1983) 144 Cal.App.3d 868, 872 [193 Cal.Rptr. 414] [holding that allegedly defamatory statements were opinion]; *Weingarten* v. *Block* (1980) 102 Cal.App.3d 129, 148 [162 Cal.Rptr. 701] [holding evidence insufficient to demonstrate actual malice]). But to our knowledge there is no published decision in which a Court of Appeal of this state has held that the neutral reportage privilege is required by either the federal or the state Constitution or otherwise is recognized in this state.

identified and responsible source"] with *Barry* v. *Time, Inc.* (N.D.Cal. 1984) 584 F.Supp. 1110, 1125-1127 [applying privilege to report of accusations made by other than a "responsible" person or organization]).

Commentators are similarly divided, with some arguing that the privilege is inconsistent with the United States Supreme Court's First Amendment jurisprudence and therefore should be rejected (Comment, *Edwards v. National Audubon Society, Inc.: A Constitutional Privilege to Republish Defamation Should Be Rejected* (1982) 33 Hastings L.J. 1203), and others endorsing the privilege in concept but taking differing positions about how it should be defined (compare, e.g., Note, *The Developing Privilege of Neutral Reportage* (1983) 69 Va. L.Rev. 853 [would require that the target be a public figure or official, that the report relate to a preexisting public controversy, that the report not concur in or endorse the defamation, and that the report be fair and accurate], with Boasberg, *With Malice Toward None: A New Look at Defamatory Republication and Neutral Reportage* (1991) 13 Hastings Comm. & Ent. L.J. 455 [would not require that report be neutral or that source be responsible and would recognize privilege if either source or target is a public figure]).[3]

B. *Analysis*

 Without deciding whether some form of the neutral reportage privilege should be recognized in this state, the Court of Appeal in this case declined to apply the neutral reportage privilege on the ground that Khawar

[3]For a sampling of the legal literature on this topic, see Note, *The Newsworthiness Requirement of the Privilege of Neutral Reportage Is a Matter of Public Concern* (1996) 65 Fordham L.Rev. 789 (would require that report relate to a matter of public concern, rather than merely a matter that is newsworthy); Comment, *Neutral Reportage: The Case for a Statutory Privilege* (1992) 86 Nw. U. L.Rev. 417 (would require accurate reporting of an accusation relating to a matter of public interest either by or about a public official or public figure and available means of redress to the accusation's target); Comment, *Neutral Reportage: Making Sense of Edwards v. National Audubon Society, Inc.* (1991) 20 Cap. U. L.Rev. 471 (would require a public controversy, serious charges made by a party to that controversy against another party to that controversy, and accurate and fair report, but would not require that the target be a public official or public figure or that the accuser be prominent or responsible); McCraw, *The Right to Republish Libel: Neutral Reportage and the Reasonable Reader* (1991) 25 Akron L.Rev. 335 (would require that target be public figure or official and that report accurately reflect the reporter's knowledge about the validity of the accusations); Comment, *Price v. Viking Penguin, Inc.: The Neutral Reportage Privilege and Robust, Wide Open Debate* (1990) 75 Minn. L.Rev. 157 (would require accurate reporting of accusations relating to matter of public concern, but would not require that either accuser or target be public figures or official, that accuser be prominent or responsible, or that the report be neutral, so long as the report does not adopt the accusation as its own); Comment, *Restricting the First Amendment Right to Republish Defamatory Statements* (1981) 69 Geo. L.J. 1495 (would extend privilege to serious and credible accusations by private figures against public figures and public officials).

is a private figure. Globe argues that this conclusion is erroneous either because Khawar is a public figure or because the neutral reportage privilege extends to defamatory falsehoods about private figures. In concluding that Khawar is a private figure, we have already rejected the first of these grounds. We now consider the second.

Because the United States Supreme Court has never held that the First Amendment requires recognition of a neutral reportage privilege, the very existence of the privilege as a matter of constitutional law is uncertain. Deciding whether either the federal or the state Constitution mandates some form of neutral reportage privilege is a task that we leave for another day. Even if some form of the privilege is constitutionally required, we are satisfied that any required privilege would not immunize defamatory statements about private figures like Khawar.

As originally articulated in *Edwards, supra,* 556 F.2d 113, the constitutional neutral reportage privilege applies only to publications of defamatory statements concerning public officials or public figures. (*Id.* at p. 120.) Among the courts that recognize the privilege in one form or another, almost all acknowledge this limitation.[4] For example, the federal Court of Appeals for the Tenth Circuit declined to apply the neutral reportage privilege to a defamation action by a private figure, stating: "The protections afforded the press when it reports on public officials and public figures do not shield it from liability when it publishes defamatory statements concerning private individuals." (*Dixson* v. *Newsweek, Inc.* (10th Cir. 1977) 562 F.2d 626, 631; see also *Crane* v. *Arizona Republic* (C.D.Cal. 1989) 729 F.Supp. 698, 710, affd. in part, vacated in part (9th Cir. 1992) 972 F.2d 1511.)

Some commentators have argued that the privilege should apply to a published report of an accusation that a public figure has made against a

---

[4]One district of the Illinois Appellate Court has stated that the privilege applied to " 'items of information relating to public issues, personalities, or programs,' " thus expanding the privilege to include defamation of private figures. (*Gist* v. *Macon County Sheriff's Department* (1996) 284 Ill.App.3d 367, 379 [219 Ill.Dec. 701, 671 N.E.2d 1154, 1162; *Krauss* v. *Champaign News Gazette, Inc.* (1978) 59 Ill.App.3d 745, 747 [17 Ill.Dec. 78, 375 N.E.2d 1362, 1363].) But another district of the Illinois Appellate Court has declined to recognize the neutral reportage privilege in any form. (*Tunney* v. *American Broadcasting Co.* (1982) 109 Ill.App.3d 769 [65 Ill.Dec. 294, 441 N.E.2d 86]; *Newell* v. *Field Enterprises, Inc.* (1980) 91 Ill.App.3d 737, 757 [47 Ill.Dec. 429, 415 N.E.2d 434, 452, 20 A.L.R.4th 551].) The Illinois Supreme Court has declined to resolve this conflict. (See *Catalano* v. *Pechous* (1980) 83 Ill.2d 146, 170 [50 Ill.Dec. 2242, 419 N.E.2d 350, 362].)

In Ohio, one intermediate appellate court said it perceived "no legitimate difference between the press's accurate reporting of accusations made against a private figure and those made against a public figure, when the accusations themselves are newsworthy and concern a matter of public interest." (*April* v. *Reflector-Herald, Inc.* (1988) 46 Ohio App.3d 95, 98 [546 N.E.2d 466, 469].) But since that decision, the Ohio Supreme Court has expressly declined to recognize the neutral reportage privilege in any form. (*Young* v. *The Morning Journal* (1996) 76 Ohio St.3d 627, 629 [669 N.E.2d 1136, 1138].)

private figure because "the public has a greater interest in knowing what its public figures are saying than it does in protecting private figures from accusations by public figures." (Boasberg, *With Malice Toward None: A New Look at Defamatory Republication and Neutral Reportage, supra,* 13 Hastings Comm. & Ent. L.J. 455, 483.) They reason like this: "Through an understanding of who is saying what, public figures may be analyzed more insightfully, their statements reflecting as much about themselves as they do about the target. Inevitably, the conflicting interests are considered in a balancing test. It is more important to refrain from chilling republication of speech made by public figures, often the political speech at the core of the first amendment, than to protect the reputations of private figure targets." (*Id.* at pp. 483-484; see also Comment, *Neutral Reportage: Making Sense of Edwards v. National Audubon Society, Inc., supra,* 20 Cap. U. L.Rev. 471, 493.) Under this view, the neutral reportage privilege would protect the Globe article, even though it reported a false and defamatory accusation against a private figure (that is, Khawar), if the person who made the original accusation (that is, Morrow) was a public figure.

Because we do not accept this view of the neutral reportage privilege, we do not decide whether Morrow was a public figure. We find more persuasive the arguments of other commentators that republication of accusations made against private figures is never protected by the neutral reportage privilege, whether or not the person who made the original accusation was a public figure. These commentators explain that although the public has a legitimate interest in knowing that prominent individuals have made charges, perhaps unfounded, against a private figure, recognition of an *absolute privilege* for the republication of those charges would be inconsistent with the United States Supreme Court's insistence on the need for balancing the First Amendment interest in promoting the broad dissemination of information relevant to public controversies against the reputation interests of private figures: "If the scope of the privilege were to include defamations of private figures, a neutral reportage route out of liability could emasculate the *Gertz*[, *supra,* 418 U.S. 323] distinction between private and public figure plaintiffs." (Note, *The Developing Privilege of Neutral Reportage, supra,* 69 Va. L.Rev. 853, 871; see also McCraw, *The Right to Republish Libel: Neutral Reportage and the Reasonable Reader, supra,* 25 Akron L.Rev. 335, 363 [stating the public figure requirement "has been consistently upheld, offers reputational protection to those who do not voluntarily involve themselves in public matters, and is consistent with Supreme Court jurisprudence from [*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254] on" (fns. omitted)]; see also Comment, *Constitutional Privilege to Republish Defamation* (1977) 77 Colum. L.Rev. 1266, 1278.)

We agree. Only rarely will the report of false and defamatory accusations against a person who is neither a public official nor a public figure provide

information of value in the resolution of a controversy over a matter of public concern. On the other hand, the report of such accusations can have a devastating effect on the reputation of the accused individual, who has not voluntarily elected to encounter an increased risk of defamation and who may lack sufficient media access to counter the accusations. As this court has remarked, "[a] reasonable degree of protection for a private individual's reputation is essential to our system of ordered liberty." (*Brown* v. *Kelly Broadcasting Co.*, *supra*, 48 Cal.3d 711, 743.) The availability of a defamation action against the source of the falsehood may be an inadequate remedy if the source is insolvent or otherwise unable to respond in damages. Moreover, it is questionable whether money damages are ever a completely adequate compensation for injury to reputation.

Khawar is a private figure, and, as pointed out above, most jurisdictions (and law review commentators) that recognize a neutral reportage privilege agree that it should extend only to defamatory statements made about public figures or public officials. In concluding that the neutral reportage privilege is unavailable here because Khawar is a private figure, we do not decide or imply either that the neutral reportage privilege exists as to republished defamations about public figures or that Globe established other possible requirements of the privilege here. In particular, we do not decide whether Morrow, the source of the false and defamatory accusation, is a public figure. Nor do we decide whether the Globe article's report of the accusation was neutral or fair, or whether the Globe article would appear to a normal reader to have concurred in or espoused the false and defamatory accusation. We hold only that the Court of Appeal did not err when it concluded that "in California there is no neutral reportage privilege extending to reports regarding private figures."[5]

## IV. OTHER ISSUES

Globe raises three other, more fact-specific issues. It contends: (1) the Court of Appeal erred in holding that the evidence presented at trial is sufficient to support the jury's finding of actual malice; (2) the Court of Appeal erred in holding that the evidence is sufficient to support the jury's finding of negligence; and (3) the trial court erred in injecting an "original libel" theory into the case at trial. We consider these contentions in turn.

### A. *Actual Malice*

■ The First Amendment to the federal Constitution, as authoritatively construed by the United States Supreme Court, does not require a private

[5]A few days before oral argument in this court, Globe submitted a request for judicial notice of two newspaper articles concerning a recently published book about the life of President John F. Kennedy. Because the articles have no relevance to the issues we decide here, we deny the request.

figure plaintiff to prove actual malice to recover damages for actual injury caused by publication of a defamatory falsehood. (*Gertz, supra,* 418 U.S. 323, 347 [94 S.Ct. 2997, 3010-3011].) Rather, in this situation, the individual states may define the appropriate standard of liability for defamation, provided they do not impose liability without fault. (*Ibid.;* see also *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 761 [105 S.Ct. 2939, 2946, 86 L.Ed.2d 593] (plur. opn. of Powell, J.); *id.* at p. 764 [105 S.Ct. at p. 2948] (conc. opn. of Burger, C. J.); *id.* at p. 774 [105 S.Ct. at p. 2953] (conc. opn. of White, J.) [private figure plaintiff need not prove actual malice to recover presumed or punitive damages if the defamatory publication was not on a matter of public concern].) In California, this court has adopted a negligence standard for private figure plaintiffs seeking compensatory damages in defamation actions. (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d 711, 742.)

There is a different rule, however, for recovery of either punitive damages or damages for presumed injury. The United States Supreme Court has held that to recover such damages, even a private figure plaintiff must prove actual malice if the defamatory statement involves matters of public concern. (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc., supra,* 472 U.S. 749, 761 [105 S.Ct. 2939, 2946-2947] (plur. opn. of Powell, J.); *id.* at p. 764 [105 S.Ct. at p. 2948] (conc. opn. of Burger, C. J.); *id.* at p. 774 [105 S.Ct. at p. 2953] (conc. opn. of White, J.); *Gertz, supra,* 418 U.S. 323, 349 [94 S.Ct. 2997, 3011-3012].) We agree with Globe that the Kennedy assassination is a matter of public concern.

 Because in this defamation action Khawar is a private figure plaintiff, he was required to prove only negligence, and not actual malice, to recover damages for actual injury to his reputation. But Khawar was required to prove actual malice to recover punitive or presumed damages for defamation involving the Kennedy assassination. Because Khawar sought punitive and presumed damages as well as damages for actual injury, the issues of both actual malice and negligence were submitted to the jury. The jury found that in publishing the Globe article Globe acted both negligently and with actual malice. Globe challenged both findings on appeal. In this court, Globe contends that the Court of Appeal erred in rejecting its challenges to these two findings.

We consider first the issue of actual malice. In doing so, we consider only actual malice as defined in decisions of the United States Supreme Court imposing constitutional restrictions on the right to recover damages for defamation. Because Globe has raised no issue concerning proof of malice as defined under state law (see, e.g., Civ. Code, § 48a, subd. 4(d)), we do not address what additional proof requirements, if any, state law may impose.

When a finding of actual malice is challenged on appeal, the reviewing court "must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." (*Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 514 [104 S.Ct. 1949, 1967, 80 L.Ed.2d 502]; accord, *Harte-Hanks Communications* v. *Connaughton, supra,* 491 U.S. 657, 686 [109 S.Ct. 2678, 2695].) This means that although "credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the 'opportunity to observe the demeanor of the witnesses,' " the reviewing court must "consider the factual record in full" and "must ' "examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect." ' " (*Harte-Hanks Communications* v. *Connaughton, supra,* 491 U.S. 657, 688 [109 S.Ct. 2678, 2696]; see also *id.* at p. 690 [109 S.Ct. at p. 2697] [accepting credibility determinations necessarily implied by jury's answers to special interrogatories]; *id.* at p. 694 [109 S.Ct. at p. 2699] (conc. opn. of White, J., joined by Rehnquist, C. J.).)

Having independently reviewed the full record, we agree with the Court of Appeal that clear and convincing proof supports the jury's finding of actual malice.

In this context, actual malice means that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 280 [84 S.Ct. 710, 726].) Reckless disregard, in turn, means that the publisher "in fact entertained serious doubts as to the truth of his publication." (*St. Amant* v. *Thompson, supra,* 390 U.S. 727, 731 [88 S.Ct. 1323, 1325].) To prove actual malice, therefore, a plaintiff must "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubts as to the truth of his statement." (*Bose Corp.* v. *Consumers Union of U.S., Inc., supra,* 466 U.S. 485, 511, fn. 30 [104 S.Ct. 1949, 1965]; see also *McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835, 860 [231 Cal.Rptr. 518, 727 P.2d 711].)

Actual malice is judged by a subjective standard; otherwise stated, "there must be sufficient evidence to permit the conclusion that the defendant . . . had a 'high degree of awareness of . . . probable falsity.' " (*Harte-Hanks Communications* v. *Connaughton, supra,* 491 U.S. 657, 688 [109 S.Ct. 2678, 2696].) To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards. (*Ibid.*; see also *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d 244, 257-258.) When, as in this case, a finding of

actual malice is based on the republication of a third party's defamatory falsehoods, "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient." (*Harte-Hanks Communications* v. *Connaughton, supra,* 491 U.S. 657, 688 [109 S.Ct. 2678, 2696].) Nonetheless, the actual malice finding may be upheld " 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports' " (*ibid.*), and the republisher failed to interview obvious witnesses who could have confirmed or disproved the allegations (*id.* at p. 682 [109 S.Ct. at p. 2693]) or to consult relevant documentary sources (*id.* at pp. 683-684 [109 S.Ct. at pp. 2693-2694] [failure to listen to tape]).

▮▮▮ There were, to say the least, obvious reasons to doubt the accuracy of the Morrow book's accusation that Khawar killed Kennedy. The assassination of a nationally prominent politician, in the midst of his campaign for his party's nomination for the presidency, had been painstakingly and exhaustively investigated by both the FBI and state prosecutorial agencies. During this massive investigation, these agencies accumulated a vast quantity of evidence pointing to the guilt of Sirhan as the lone assassin. As a result, Sirhan alone was charged with Kennedy's murder. At Sirhan's trial, "it was undisputed that [Sirhan] fired the shot that killed Senator Kennedy" and "[t]he evidence also established conclusively that he shot the victims of the assault counts." (*People* v. *Sirhan, supra,* 7 Cal.3d 710, 717.) The jury returned a verdict finding beyond a reasonable doubt that Sirhan was guilty of first degree murder. On Sirhan's appeal from the resulting judgment of death, this court carefully reviewed the evidence and found it sufficient to sustain the first degree murder conviction. (*Id.* at pp. 717-728.) In asserting that Khawar, and not Sirhan, had killed Kennedy, the Morrow book was making the highly improbable claim that results of the official investigation, Sirhan's trial, and this court's decision on Sirhan's appeal, were all fundamentally mistaken.

Because there were obvious reasons to doubt the accuracy of the Morrow book's central claim, and because that claim was an inherently defamatory accusation against Khawar, the jury could properly conclude that Globe acted with actual malice in republishing that claim if it found also, as it impliedly did, that Globe failed to use readily available means to verify the accuracy of the claim by interviewing obvious witnesses who could have confirmed or disproved the allegations or by inspecting relevant documents or other evidence. (*Harte-Hanks Communications* v. *Connaughton, supra,* 491 U.S. 657, 682-684 [109 S.Ct. 2678, 2693-2694].) The evidence at trial supports the jury's implied finding that neither Blackburn (who wrote the Globe article) nor Globe's editors made any such effort.

Preliminarily, we note that this was not a situation in which time pressures made it impossible or impractical to investigate the truth of the accusation.

Kennedy had been assassinated in 1968. In November 1988, when Round-table published the Morrow book, and in April 1989, when Globe published its article, the Kennedy assassination had long ceased to be an issue that urgently engaged the public's attention. Before publishing an article accusing a private figure of a sensational murder, Globe could well have afforded to take the time necessary to investigate the matter with sufficient thoroughness to form an independent judgment before republishing an accusation likely to have a devastating effect on the reputation of the person accused. But Globe did not do so.

Neither Blackburn nor Globe's editors contacted any of the eyewitnesses to the assassination, some of whom were prominent individuals who could easily have been located. At the trial, for example, Roosevelt Grier, a well-known former professional football player and volunteer Kennedy security aide who was present in the pantry area where Kennedy was shot, testified that after the assassination he had remained active in public life and was not "real difficult to find," but that no one from Globe had contacted him. Frank Mankiewicz, Kennedy's press secretary and a witness to the assassination, testified that in 1989, when the Globe article was published, he was vice-chairman of a public relations firm in Washington, D.C., and was listed in the telephone directory for that city, yet no one from Globe had contacted him. Nor is there any evidence that anyone working for Globe reviewed the voluminous public records of the government investigation of the Kennedy assassination or the Sirhan trial. Indeed, Globe's managing editor, Robert Taylor, conceded during his testimony that Globe made no attempt to independently investigate the truth of any of the statements in the Morrow book. In short, phrasing our conclusion in the language of the United States Supreme Court, "Accepting the jury's determination that [Globe]'s explanations for these omissions were not credible, it is likely that [Globe]'s inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the Morrow book]'s charges." (*Harte-Hanks Communications* v. *Connaughton, supra,* 491 U.S. 657, 692 [109 S.Ct. 2678, 2698].) As the United States Supreme Court added, "Although failure to investigate will not alone support a finding of actual malice, [citation], the purposeful avoidance of the truth is in a different category." (*Ibid.*)

Globe makes little or no effort to persuade us that the Morrow book's accusations were other than highly implausible or that its own editors tried to verify the truth of these accusations. Instead, Globe points to the jury's advisory special verdict finding that the Globe article was a neutral and accurate report of the Morrow book. Globe observes that the jury was instructed to return this special verdict only if it made a subsidiary finding

that Morrow was a prominent and responsible source. Globe argues generally that it had no duty to verify the claims, no matter how improbable, of a prominent and responsible source like Morrow, and that as a result its failure to conduct any investigation whatsoever of Morrow's highly improbable claims does not establish that it acted with actual malice in republishing Morrow's accusation against Khawar. We are not persuaded.

The jury's special verdict stating that the Globe article was a neutral and accurate report of the Morrow book was merely advisory and is contradicted by both the trial court's finding to the contrary, and, insofar as the advisory special verdict implies that Morrow was a trustworthy source upon whom Globe could justifiably rely, by the jury's special verdict finding that Globe acted with actual malice in republishing Morrow's accusation against Khawar. Moreover, we find in the record no substantial evidence that either Blackburn or Globe's editors were aware of facts about Morrow that would justify unquestioning reliance on Morrow's highly improbable accusations. Globe had no prior experience with Morrow on which it could form a judgment that Morrow was a person who was likely to provide reliable information on matters such as the Kennedy assassination. Morrow did not hold high public office or a position of great social responsibility, nor is there evidence that Morrow's reputation in the scientific, academic, or journalistic community qualified him as a credible and reliable commentator on public affairs.

To support its claim that Morrow was a reliable source, Globe relies primarily on the trial testimony of Ulric Shannon. Called as a witness by Khawar, Shannon testified that he was a resident of Montreal, Canada, that he was then 19 years of age, and that he had graduated from high school and would soon be attending a university in the Montreal area. Shannon said he had been studying the assassination of President John F. Kennedy "for about five years," had read "at least 100 books on the assassination," had "interviewed authors and experts," and had written articles on this subject that had been published by the New York State University and the Montreal Gazette. He had read the Morrow book and two other books Morrow had written. Based on his own attempts to verify certain of Morrow's claims, on conversations with other researchers, and on his own interview of Morrow in 1993, he had formed the opinion that Morrow was not a credible author or source and that all three of Morrow's books contain "a great number of factual errors."

Globe does not, of course, rely on this particular testimony. Rather, it relies on Shannon's testimony on cross-examination, in which he admitted having written an article in 1993 in which he said (with, as he remarked,

"some bewilderment") that "Morrow's place in the [President Kennedy] assassination controversy has not been seriously challenged over the last 18 years," that Morrow "had gained the respect of . . . otherwise solid researchers," and that the reason for this might be that "his scenario of the [President Kennedy] assassination falls well within mainstream theorizing."

On redirect, Shannon restated his own opinion that Morrow's writings on the assassination of President Kennedy should be regarded as fiction, adding that this view was shared by "the majority of the researchers in the assassination community."

Globe's attempt to draw support from carefully selected portions of Shannon's testimony is unjustified. Fairly summarized, Shannon's opinion was that, with a few exceptions, serious researchers in the assassination research community did *not* regard Morrow as a reliable source.[6] The trial record contains no evidence that Globe's editors were aware of or relied upon the opinion of any particular researcher within that community. Thus, we conclude that Morrow's reputation for credibility within journalistic or academic circles, such as it may have been, provides no justification for Globe's failure to make any effort to verify the truth of the Morrow book's inherently incredible accusation against Khawar.

Having independently reviewed the record, we agree with the Court of Appeal that the evidence at trial strongly supports an inference that Globe purposefully avoided the truth and published the Globe article despite serious doubts regarding the truth of the accusation against Khawar. In short, we conclude that clear and convincing evidence supports the jury's finding that in republishing the Morrow book's false accusation against Khawar, Globe acted with actual malice—that is, with reckless disregard of whether the accusation was false or not.

B. *Negligence*

Globe's challenge to the sufficiency of the evidence to support the finding of negligence merits little consideration.

Because actual malice is a higher fault standard than negligence, a finding of actual malice generally includes a finding of negligence, and evidence that is sufficient to support a finding of actual malice is usually, and perhaps invariably, sufficient also to support a finding of negligence. In any event,

---

[6]During a hearing outside the jury's presence, Shannon had characterized Morrow's reputation in the assassination research community, which included history professors and journalists, as "abysmal."

we are satisfied that the evidence we previously reviewed, and which we have concluded clearly and convincingly establishes actual malice in the form of reckless disregard, is sufficient also to sustain the finding of negligence.

In arguing that the evidence does not support a finding of negligence, Globe relies upon the jury's advisory finding (rejected by the trial court) that the Globe article was a neutral and accurate report of the Morrow book. In so arguing, Globe asserts, in essence, that it cannot be negligence to republish a defamatory accusation neutrally and accurately, whether or not the republisher knows or strongly suspects that the accusation is false. Globe's argument is thus a variation on its claim to be protected by a neutral reportage privilege. We have rejected that claim and find it no more persuasive in the context of a challenge to the finding of negligence.

### C. Original Libel

In rejecting the jury's advisory finding that the Globe article was a neutral and accurate report of the Morrow book, the trial court noted that although the book and the article both used the same photograph showing Khawar near Kennedy moments before the assassination, it was possible to identify Khawar from the photograph as it appeared in the Globe article (with Khawar's image enlarged and emphasized by inclusion of an arrow) but impossible to identify Khawar from the photograph as it appeared in the Morrow book (lacking the arrow and generally darker and less distinct). The trial court reasoned that because Khawar was not identified by name in the Morrow book and could not be identified by any of the photographs in the Morrow book, his theory of liability against Morrow was fatally defective. Accordingly, the trial court vacated Morrow's default and entered judgment in his favor.

Globe contends that by these actions the trial court unfairly injected an original libel theory into a trial that had been litigated on the assumption that Globe's liability was predicated solely on republication of a defamatory falsehood that appeared in the Morrow book.

The Court of Appeal rejected this argument in a footnote, stating that "the issue of whether the [Globe] article was a neutral and accurate report [of the Morrow book] is irrelevant on this appeal because of our holding . . . that Khawar was a private figure and that in California there is no neutral reportage privilege applicable to private figures."

Globe renews its contention in this court but appears to concede that it becomes relevant only if we were to hold that a neutral and accurate report

of the Morrow book would be protected by the neutral reportage privilege. Because we have held, to the contrary, that this state does not recognize a neutral reportage privilege for the republication of defamatory falsehoods about private figures like Khawar, we need not further address this claim.

## V. Disposition

The judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

The petition of appellant Globe International, Inc., for a rehearing was denied December 22, 1998, and the opinion was modified to read as printed above.