Filed 6/5/23 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOE E. COLLINS III,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>MAXINE WATERS et al.,<br><br>    Defendants and Respondents. | B312937<br><br>Los Angeles County<br>Super. Ct. No. 20STCV37401<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:

IT IS ORDERED the opinion in the above-entitled matter filed on May 10, 2023, be modified in the following ways:

1.  On page 2, the following sentences shall be added to the end of the first full paragraph:
    The test is subjective, not objective. (*St. Amant, supra,* 390 U.S. at p. 731.)

2. On page 2, in the last paragraph, the fourth sentence, "He showed Waters a document saying so," shall be replaced with the following sentence:

    He publicized a document saying so.

3. On page 3, in the paragraph that continues from page 2, the sentence "Waters easily could have checked its authenticity, but did not," shall be replaced with the following sentence:

    In the trial court, Collins maintained Waters easily could have checked its authenticity; she neither denied this nor checked.

4. On page 6, the fourth full paragraph, "Waters's declaration did not say she asked the attorney for his personal or other knowledge about whether Collins's discharge in fact was dishonorable," shall be replaced with the following paragraph:

    Waters's declaration did not say she asked the attorney whether Collins's discharge in fact was dishonorable or what else the attorney might know about this.

5. On page 7, in the third full paragraph, the third sentence, "He claimed it would have been easy for a member of Congress like Waters to check his military discharge status," shall be replaced with the following sentence:

    Without objection, Collins testified in his written declarations that it would have been easy for a

member of Congress like Waters to check his military discharge status.

6. On page 8, the following paragraph shall be added between the first and second full paragraphs:

In response to Collins's opposition, Waters did not object to, or attempt to contest, Collins's written evidence that she "easily" could have checked to verify his discharge status. Nor did she object or register disagreement when Collins's counsel argued at the motion hearing that Waters had access to many avenues, including the "horse's mouth," to confirm the information. In passing, we note that Waters, in footnotes to her petition for *rehearing in our court*, offers internet website citations and unsourced factual assertions in a tardy effort to controvert Collins's evidence. These footnotes lack even a request for judicial notice. We disregard these citations and assertions. The place to develop the factual record is the trial court.

7. On page 9, the fourth through sixth sentences of Section II, "It was error to end this suit at this early stage, for Collins established the minimal case needed to defeat Waters's special motion to strike. Crediting his evidence, as is necessary in an anti-SLAPP analysis, Collins showed Waters had failed to take an easy and conclusive step to ascertain his discharge status. In the face of facially valid proof of error, this failure created a permissible inference of willful blindness," shall be

3

replaced with the following three sentences:

It was error to end this suit at this early stage. Crediting Collins's evidence, as is necessary in an anti-SLAPP analysis, Collins showed Waters had failed to take an easy and conclusive step to ascertain his discharge status. In the face of facially valid proof of error, this failure created a permissible inference of willful blindness, which, if believed by the fact finder, could amount to clear and convincing evidence of subjective actual malice.

8. On page 9, the last sentence of subsection A of Section II, "We review these laws," shall be replaced with the following sentence:

We review these legal cross-currents.

9. On page 10, the following sentences shall be added after the first citation in the third full paragraph:

While a defendant's failure to investigate an issue will not, alone, support a finding of actual malice, the fact a defendant purposely avoided learning the truth can support that finding. (*Id*. at p. 692; *Khawar, supra,* 19 Cal.4th at pp. 274–280.)

10. On page 10, the following paragraph shall be added between the third and fourth full paragraphs:

This standard is subjective, not objective. Reckless conduct is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing. There

4

must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. (*St. Amant*, *supra*, 390 U.S. at p. 731.)

11. On page 11, the following paragraph shall be added between the first and second full paragraphs:

At trial, a public figure plaintiff like Collins must establish actual malice by clear and convincing evidence. In the context of a special motion to strike, however, plaintiffs instead must establish only a probability they can produce clear and convincing evidence of actual malice. (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 793 (*Edward*).) In opposing such a motion, defamation plaintiffs need not establish malice by clear and convincing evidence. Rather, they must meet their minimal burden by introducing sufficient facts to establish a prima facie case of actual malice. In other words, they must establish a reasonable probability they can produce clear and convincing evidence showing that the statements were made with actual malice. (*Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 563; see also *Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 217–218, 220–224 (*Mitchell*).)

12. On page 12, the first sentence of subsection B of Section II, "As a matter of federal constitutional law,

Collins's discharge document put Waters on notice of a considerable risk that conclusive evidence wholly disproved her accusations," shall be replaced with the following sentence:

> Collins's discharge document put Waters on notice of a considerable risk that conclusive evidence wholly disproved her accusations.

13. On page 12, in the fourth full paragraph, the second sentence, "Rather, we have additional facts: the plaintiff showed the defendant facially valid and easily verifiable documentary proof creating a considerable risk the defendant was uttering a falsehood; and yet the defendant kept uttering without checking," shall be replaced with the following sentence:

> Rather, we have additional facts: the plaintiff responded to the defendant's charge with facially valid and easily verifiable documentary proof creating a considerable risk the defendant was uttering a falsehood; and yet the defendant kept uttering without checking.

14. On page 16, the following sentence shall be added to the end of the third full paragraph:

> (See also *Mitchell, supra,* 70 Cal.App.5th at pp. 221–224.)

15. On page 17, the first full paragraph, "Or the trier of fact may question why Waters would call the Navy's attorney simply to have him read an opinion she already

6

had, and why she would refrain from asking that attorney for his personal knowledge about Collins's discharge status," shall be replaced with the following paragraph:

> Or the trier of fact may question why Waters would call the Navy's attorney simply to have him read an opinion she already had, and why she would refrain from asking that attorney for his own knowledge about Collins's discharge status.

16.  On page 17, the third and fourth full paragraphs, "At this early stage of the case and without weighing the conflicting evidence, Collins established his case has at least minimal merit. [¶] Collins showed Waters an official-looking document that, if authentic, completely pierced through to absolute truth, whatever Collins's foibles might have been, no matter the federal court opinion, and irrespective of other information," shall be replaced with the following two paragraphs:

> At this early stage of the case and without weighing the conflicting evidence, Collins established the prima facie case necessary to show his case has at least minimal merit.
>
> Collins publicized an official-looking document that, if authentic, completely pierced through to absolute truth, whatever Collins's foibles might have been, no matter the federal court opinion, and irrespective of other information.

17.  On page 18, the last sentence of the second full

7

paragraph, "That fact—that it would have been *easy* to check—is in the record and is undisputed," shall be replaced with the following sentence:

That fact—that it would have been *easy* to check—is in the record and is undisputed in the record.

18. On page 18, the following paragraph shall be added between the third and fourth full paragraphs:

"Much of the evaluation of actual malice will turn on credibility evaluations. Waters's declarations steadfastly professed subjective blamelessness. The standard is subjective. There is no question about that. But testimony from a party can be trustworthy and conclusive, or self-serving and unreliable, or anywhere in between. Circumstantial evidence can be powerful proof to the contrary, or not. For instance, was Waters's call to Collins's opposing federal counsel structured and timed only to build a record and to confirm what she already knew? Or was it an open-ended inquiry that, in good faith, earnestly sought the truth? All these determinations are for the fact finder. (See *Edward, supra*, 72 Cal.App.5th at pp. 793–794.)"

19. On page 18, in the fourth full paragraph, the third and fourth sentences, "If fact finders drew this inference, Collins's proof could constitute clear and convincing evidence of actual malice. Reasonable minds could agree that people *purposefully* ignorant about the truth can have a high degree of awareness of probable

8

falsity of a claim they deliberately avoid checking," shall be replaced with the following two sentences:

> If fact finders drew this inference, Collins's proof could constitute clear and convincing evidence of subjective actual malice. Reasonable minds could unhesitatingly agree that people *purposefully* ignorant about the truth can have a high degree of subjective awareness of probable falsity of a claim they deliberately avoid checking.

The petition for rehearing filed by Respondents Maxine Waters and Citizens for Waters is denied.

There is no change in the judgment.

_____

GRIMES, Acting P. J.          WILEY, J.          VIRAMONTES, J.

9

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOE E. COLLINS III,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>MAXINE WATERS et al.,<br><br>        Defendants and Respondents. | B312937<br><br>Los Angeles County<br>Super. Ct. No. 20STCV37401 |

————————————

APPEAL from an order of the Superior Court of Los Angeles County, Yolanda Orozco, Judge.  Reversed and remanded.

Law Offices of Donna Bullock and Donna C. Bullock for Plaintiff and Appellant.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, Gary S. Lincenberg and Thomas V. Reichert for Defendants and Respondents.

————————————

Actual malice is a term of art in defamation law.  If you, with actual malice, publish falsehoods about a public figure, you

forfeit the constitutional protection of *New York Times v. Sullivan* (1964) 376 U.S. 254, 283–288. Your actual malice means the public figure can sue you for defamation. (*St. Amant v. Thompson* (1968) 390 U.S. 727, 728 (*St. Amant*).) Blameworthy disregard for truth dissolves your constitutional shield.

Actual malice, in this constitutional usage, does not mean ill will. (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 666 (*Harte-Hanks*).) Rather, people speak with actual malice when they know their statements are false, or they recklessly disregard whether their statements might be false. (*St. Amant, supra,* 390 U.S. at p. 728.) Reckless disregard, in this sense, requires defendant speakers to have a high degree of awareness of probable falsity. (*Harte-Hanks, supra,* at p. 667.)

Plaintiffs who are public figures must prove actual malice by clear and convincing evidence, but they may rely on circumstantial evidence to do so. (*Harte-Hanks, supra,* 491 U.S. at pp. 659, 668.) While a defendant's failure to investigate an issue will not, alone, support a finding of actual malice, the fact a defendant purposely avoided learning the truth can support that finding. (*Id.* at p. 692; *Khawar v. Globe International, Inc.* (1998) 19 Cal.4th 254, 274–280 (*Khawar*).)

We apply these rules to a case about an election campaign.

In 2020, challenger Joe E. Collins III and incumbent Maxine Waters competed for a seat in Congress. During the campaign, Waters accused Collins of a dishonorable discharge from the Navy. Collins shot back that he had *not* been dishonorably discharged. He showed Waters a document saying so. This document apparently was official. There was nothing suspicious about its appearance. The document, if genuine,

2

would have established without doubt that Waters's charge was false. Waters easily could have checked its authenticity, but did not. Her appellate briefing asserts that today, years later, she *still* does not know the truth about whether Collins's discharge was dishonorable.

This disinterest in a conclusive and easily-available fact could suggest willful blindness.

Collins sued Waters for defamation during the campaign, but Waters convinced the trial court to grant her special motion to strike his suit. We reverse that order. The preliminary posture of the case required the court to accept Collins's evidence as true. His evidence created a possible inference of Waters's willful blindness, which is probative of actual malice. It was error to grant Waters's anti-SLAPP motion.

I

We set out the situation in more detail.

Waters and Collins competed to represent California's 43rd congressional district. Well before the November 3, 2020 election date, Collins heard rumors Waters would claim his Navy discharge was dishonorable. So, on August 18, 2020, he posted a document on his campaign website. The document stated his discharge had been "under honorable conditions (general)."

In radio and print ads starting in August and continuing in September, October, and November 2020, Waters and her campaign told the public that Collins's discharge had been dishonorable.

Collins sued Waters and her campaign committee for defamation on September 30, 2020—more than a month before the election. He appended to his complaint a screenshot of his Facebook posting of his discharge document.

3

This posted document is the focus of this suit.

The posting showed a one-page form the parties refer to as a DD-214.

The document's title is "CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY." After listing Collins's name and personal information, the document summarizes his service record in several boxes. Near the bottom, under "TYPE OF SEPARATION," the form states "DISCHARGED."

To the right of that box is one headed "CHARACTER OF SERVICE." Typed in that box are the words "UNDER HONORABLE CONDITIONS (GENERAL)."

Collins or someone has circled these words—"UNDER HONORABLE CONDITIONS (GENERAL)"—with a red oval in the record version of the document.

Throughout this case, Collins repeatedly has emphasized his Navy discharge was "under honorable conditions (general)."

Still lower on the page is a box labeled "NARRATIVE REASON FOR SEPARATION." The words in that box are "MISCONDUCT (SERIOUS OFFENSE)."

The exhibit in the record apparently is a copy of the document from a screenshot of a Facebook website. This attachment to Collins's complaint has the word "Facebook" and a Facebook logo at the top. At the bottom are symbols denoting thumbs up and a heart and "101 Comments." The record image of this page has black redactions of some of Collins's personal information, as well as the red oval drawn around the words "UNDER HONORABLE CONDITIONS (GENERAL)."

On October 8, 2020, Collins sent his complaint, with the exhibit and a letter demanding a retraction, by certified mail to Waters at her offices in Washington, D.C. and Los Angeles.

4

Nevertheless, Waters, according to Collins, continued to tell voters Collins's discharge was dishonorable, and did so several times a day throughout October 2020 and into November.

Waters filed a special motion to strike Collins's complaint. She accompanied her motion with her two declarations.

We summarize Waters's two declarations.

Waters explained she and her staff had investigated Collins when he entered the race. They traveled to San Diego, where Collins had been stationed in the Navy.

Waters discovered two lawsuits Collins filed in San Diego.

In the first lawsuit, Collins disputed an obligation to pay child support and claimed damages of $100 million. Collins, Waters declared, filed accompanying documents showing he had purportedly created a "Royal Family of Collins Trust" into which he had placed assets like his birth certificate—an asset Collins claimed had a value of $100 billion. The total value Collins asserted for these trust items was over $700 billion. Waters appended Collins's filings to her declaration.

Waters also declared that, in his second San Diego lawsuit, Collins sued the Navy for breaching the terms of use of his campaign website. In his 2017 complaint, Collins requested his discharge be "[u]pdate[d] . . . to honorable."

A federal district court issued a decision in Collins's second case. (*Collins v. United States Navy* (2021) No. 17CV2451-MMA (BGS), 2021 WL 1998642.)

Waters declared this federal decision played a major role in her view of Collins and his discharge. In the background section of this decision, the first sentence stated, with our italics, that "[t]his action arises out of events related to [Collins's] *dishonorable discharge* from the Navy."

The federal district court issued this order on August 8, 2018.

We interrupt the temporal flow of these facts to note that, years later, the court deleted the significant word "dishonorable" from its 2018 decision. In May 2021—after the trial court granted Waters's anti-SLAPP motion and after Collins had filed his notice of appeal in this case—the federal district court, on its own motion, modified its decision to change this sentence and to remove what it termed the "inaccurate" description of Collins's discharge as "dishonorable." Without calling the discharge "honorable" or "dishonorable," then, the amended May 2021 decision simply refers to Collins's separation as a "discharge." (*Collins, supra,* 2021 WL 1998642, at *1, fn. 1.)

Returning to Waters's declarations, she recounted how she had called the attorney who represented the Navy in Collins's second lawsuit. Waters declared she asked him about the case. The attorney said he would pull a copy of the decision and would call Waters back. "When he called me back, he told me, 'It says right here, he was dishonorably discharged!' "

Waters's declaration did not say she asked the attorney for his personal or other knowledge about whether Collins's discharge in fact was dishonorable.

Waters declared Collins filed other documents in his second lawsuit that she said revealed his "dishonorable character." Waters claimed the documents showed Collins had been disciplined for running for President while in the Navy.

Waters also alleged the documents showed the Navy had disciplined Collins for providing alcohol to an underage sailor and for having sex with a service member under his command. Waters stated Collins was the subject of a keepaway order and

6

that he was running a cocktail lounge, which he valued at $100 million, that was simply his on-base apartment in San Diego.

Waters also learned that, in connection with these San Diego lawsuits, Collins filed an application to proceed in forma pauperis in which he stated he was not receiving any governmental benefits. Waters declared she inferred this meant Collins's discharge had been dishonorable, for service members with honorable discharges are entitled to military benefits while those with dishonorable discharges are not.

In sum, Waters declared she had no reason to believe anything Collins told her or any document he showed her. She declared she sincerely believed Collins's discharge was dishonorable.

Collins opposed Waters's anti-SLAPP motion. He conceded the first prong of the two-prong anti-SLAPP test but asserted on prong two his case had merit because Waters had published with reckless disregard for the truth. He claimed it would have been easy for a member of Congress like Waters to check his military discharge status. Collins authenticated and appended the discharge document he had attached to his complaint—the so-called DD-214.

During this lawsuit, Collins provided Waters with five more documents from the Navy showing his discharge status had not been dishonorable.

Collins's other proof included evidence that, beginning in September 2020, Waters ran a radio advertisement in her own voice saying Collins "had his health care paid for by the Navy." In her declaration, Waters had stated she knew a dishonorably discharged veteran is *ineligible* for military benefits. Collins

argued this radio ad proved Waters *knew* he had not been dishonorably discharged.

Collins declared the five types of military discharges are: "(1) Honorable, (2) General, Under Honorable Conditions (which is my discharge as stated in my DD-214); (3) Under Other than Honorable Conditions; (4) Bad Conduct; and (5) Dishonorable."

The trial court granted Waters's special motion to strike. On prong two, the court found Collins failed to meet his burden of proving actual malice by clear and convincing evidence. The court ruled Waters subjectively and sincerely doubted the validity of the document shown in Collins's Facebook posting. Waters, the court ruled, had three bases for believing Collins had been dishonorably discharged.

1. Waters relied on the district court order stating Collins's discharge was "dishonorable."
2. Collins had asked the district court to update his discharge to honorable.
3. Collins's past conduct convinced Waters that Collins lacked integrity and veracity.

Quoting *Reader's Digest Association, Inc. v. Superior Court* (1984) 37 Cal.3d 244, 258 (*Reader's Digest*), the court ruled Waters's failure to conduct a thorough and objective investigation, standing alone, did not prove actual malice. The court also granted Waters's motion for attorney fees.

Collins appealed the order granting the anti-SLAPP motion.

## II

Free speech is vital in America, but truth has a place in the public square as well. Reckless disregard for the truth can create liability for defamation. When you face powerful documentary

8

evidence your accusation is false, when checking is easy, and when you skip the checking but keep accusing, a jury could conclude you have crossed the line.  It was error to end this suit at this early stage, for Collins established the minimal case needed to defeat Waters's special motion to strike.  Crediting his evidence, as is necessary in an anti-SLAPP analysis, Collins showed Waters had failed to take an easy and conclusive step to ascertain his discharge status.  In the face of facially valid proof of error, this failure created a permissible inference of willful blindness.  The trier of fact ultimately may draw other inferences more favorable to Waters and may reject Collins's case lock, stock, and barrel.  But Collins's showing was enough to allow this litigation to go forward.  We reverse and remand for further proceedings.

## A

Legal cross-currents run through this case.  Within broad limits, federal first amendment law strongly favors *substantive* protection of free speech.  But state anti-SLAPP law sets *procedural* rules about how courts view the factual record:  we must accept the plaintiff's proof, we do not resolve conflicts in the evidence, and we cannot settle credibility contests.  We review these laws.

## 1

The federal constitutional guarantee of free speech has its fullest and most urgent application in the conduct of political campaigns.  Those engaged in political debate are entitled not only to speak responsibly, but also to speak foolishly and without moderation.  (*Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 949–950 (*Beilenson*).)

It is "a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." (*New York Times v. Sullivan, supra,* 376 U.S. at p. 269, quotation marks and citation omitted.)  Our "profound national commitment [is] to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*Id.* at p. 270.)

Courts formulated the actual malice standard with keen awareness that, in free debate, erroneous statements are inevitable.  Courts must protect some errors to give free expression breathing space to survive.  The actual malice standard is exacting:  it protects some falsehoods in order to safeguard speech that matters. (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1168 (*Annette F.*).)

Plaintiffs like candidate Collins who are public figures must prove actual malice by clear and convincing evidence and may rely on circumstantial evidence to do so. (*Harte-Hanks, supra,* 491 U.S. at pp. 659, 668.)  "The clear and convincing standard requires that the evidence be such as to command the unhesitating assent of every reasonable mind." (*Beilenson, supra*, 44 Cal.App.4th at p. 950.)

These federal constitutional rules govern.  The parties have not suggested state constitutional law differs.

2

The pivotal state law is the anti-SLAPP statute.  This statute created an efficient mechanism for the early and economical dismissal of nonmeritorious claims arising from protected activity. (*Annette F., supra*, 119 Cal.App.4th at p. 1159.)  The procedure's goal is, at the very beginning of the

10

lawsuit, to weed out meritless claims. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.)

Analysis of special motions to strike proceeds in two steps. Collins conceded the first step about whether his claims arose from protected activity: indeed they did. In the second step, Collins had the burden of showing his claims had at least minimal merit. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.)

This second step required Collins to demonstrate a probability of success. In this summary-judgment-like process, courts do not weigh evidence or resolve conflicting factual claims. Instead they evaluate whether plaintiffs like Collins have stated legally sufficient claims and whether these plaintiffs have made a prima facie evidentiary showing sufficient to sustain a favorable judgment. Courts are required to accept the plaintiff's evidence as true. The task is to evaluate the defense showing only to determine if it defeats the plaintiff's claims as a matter of law. If the lawsuit has even minimal merit, the motion fails and the suit proceeds. Appellate review is independent. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster*).)

These state procedural rules have a strong impact on this case, because one main line of attack for Waters is her contention that Collins is so disreputable that she could not believe anything he said. At this preliminary stage of the case, however, we must accept the plaintiff's evidence fully. We do not resolve credibility disputes or evidentiary conflicts. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714.) A court cannot grant a special motion to strike if the plaintiff has presented admissible evidence that, if believed by the trier of fact, would support a cause of action against the defendant. (*Id.* at pp. 729, 736.)

11

B

As a matter of federal constitutional law, Collins's discharge document put Waters on notice of a considerable risk that conclusive evidence wholly disproved her accusations. It would have been easy for Waters then to check, but Waters kept repeating the accusation without checking. A reasonable jury could conclude Waters's lack of interest was studied: a purposeful effort to maintain plausible deniability. If a factfinder drew an inference of willful blindness, it would impeach Waters's claim of subjective blamelessness. The answer to this question of credibility was for the fact finder to ascertain. The decision to grant the special motion to strike was error.

The trial court quoted this sentence from page 258 of the *Reader's Digest* decision, to which we add our emphasis: "The failure to conduct a thorough and objective investigation, *standing alone*, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy."

That quotation is accurate and binding. But the *Reader's Digest* decision also stated a "failure to investigate" was among the pertinent factors that, "in an *appropriate case*, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Reader's Digest*, *supra*, 37 Cal.3d at p. 258, italics added.)

This is an "appropriate case" fitting the *Reader's Digest* decision, for here the failure to investigate did not stand alone. Rather, we have additional facts: the plaintiff showed the defendant facially valid and easily verifiable documentary proof creating a considerable risk the defendant was uttering a falsehood; and yet the defendant kept uttering without checking. There was nothing like that in the *Reader's Digest* case. (See

12

*Reader's Digest*, *supra*, 37 Cal.3d at p. 259 ["nothing . . . suggest[ed] inaccuracy"].)

Nor is this a case a debate over whether a word is merely "technically incorrect." (*Annette F., supra,* 119 Cal.App.4th at p. 1170 ["convicted" can refer to a noncriminal adjudication of domestic violence]; see also *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1453 [ordinary people do not equate "guilty" with only criminal guilt].)

Rather, the guiding authorities are three other decisions: *Harte-Hanks*, *Khawar*, and *Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1053 (*Antonovich*).

In *Harte-Hanks*, Connaughton was an unsuccessful candidate in a judicial election who sued Journal News, which had supported his rival. About one week before the election, Journal News ran a front-page story quoting a grand jury witness named Thompson accusing Connaughton of using "dirty tricks" in a grand jury investigation. A jury found that the news story was defamatory and that clear and convincing evidence showed the paper had published with actual malice.

The Supreme Court of the United States ruled Journal News had published with actual malice. Part of the key evidence was that Connaughton made exculpatory audiotapes available to Journal News but "no one at the newspaper took the time to listen to them." (*Harte-Hanks*, *supra*, 491 U.S. at pp. 660–661, 690–692.) Listening to these audiotapes would have been a "simple means" of verifying—or disproving—a challenged claim. (*Id.* at p. 683.)

"Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her. Accepting the jury's

13

determination that [Journal News's] explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of *a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity* of Thompson's charges. *Although failure to investigate will not alone support a finding of actual malice, [citation], the purposeful avoidance of the truth is in a different category*." (*Harte-Hanks*, *supra*, 491 U.S. at p. 692, italics added; see also *id.* at pp. 682–683.)

"[I]f the Journal News had serious doubts concerning the truth of Thompson's remarks, *but was committed to running the story*, there was good reason not to interview Stephens—while denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, a denial coming from Stephens would quickly put an end to the story." (*Harte-Hanks*, *supra*, 491 U.S. at p. 682.)

In sum, crucial proof of Journal News's actual malice was its "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity." (*Harte-Hanks*, *supra*, 491 U.S. at p. 692.) *Do not listen to the audiotapes; do not interview Patsy Stephens. We are committed to running the story. The audiotapes and Stephens can tell us only what we do not want to hear.* This was evidence of actual malice.

In *Khawar*, a journalist sued the Globe newspaper for repeating claims from a book by one Morrow accusing the journalist of assassinating Robert Kennedy. A jury awarded the journalist over $1 million because Globe republished falsehoods with actual malice. The California Supreme Court determined there was clear and convincing evidence of actual malice. That finding may be upheld, the court ruled, where there are obvious

14

reasons to doubt the accuracy of the challenged report, and the one republishing the report failed to consult "relevant documentary sources." (*Khawar*, *supra*, 19 Cal.4th at pp. 259–261, 273–276.) The court ruled the paper "failed to use readily available means to verify the accuracy of the claim" at issue. (*Id.* at p. 276.) For example, the reporter who wrote the article had not "contacted any of the eyewitnesses to the assassination, some of whom were prominent individuals who could easily have been located." (*Id.* at p. 277.)

"Nor is there any evidence that anyone working for Globe reviewed the voluminous public records of the government investigation of the Kennedy assassination or the Sirhan trial. Indeed, Globe's managing editor, Robert Taylor, conceded during his testimony that Globe made no attempt to independently investigate the truth of any of the statements in the Morrow book. In short, phrasing our conclusion in the language of the United States Supreme Court, 'Accepting the jury's determination that [Globe]'s explanations for these omissions were not credible, it is likely that [Globe]'s inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the Morrow book]'s charges.'" (*Khawar*, *supra*, 19 Cal.4th at p. 277.)

The California Supreme Court concluded the trial evidence "strongly supports an inference that Globe purposefully avoided the truth and published the Globe article despite serious doubts regarding the truth of the accusation against Khawar." (*Khawar*, *supra*, 19 Cal.4th at p. 279.)

In *Antonovich*, there were two candidates for a seat on a county board of supervisors: the incumbent, Antonovich, and his challenger, Ward. Ward previously held that seat on the board of

supervisors, but Antonovich defeated Ward in an earlier election. Years later, the two faced off again, and during this second contest the now-incumbent Antonovich accused Ward, when Ward departed the office after his earlier defeat, of spitefully shredding official files just before Antonovich moved in. (*Antonovich, supra*, 234 Cal.App.3d at p. 1045.)  Antonovich's point was Ward destroyed important public property just to make life hard for Antonovich.  During the campaign, Antonovich repeated variations of this charge against Ward some six times. (*Id*. at p. 1049.)

Ward publicly challenged Antonovich's shredding accusation.  Afterwards Antonovich persisted in repeating the substance of this charge without taking steps to inquire into its truth, despite an offer from Ward of proof for Antonovich's inspection.  (*Antonovich, supra,* 234 Cal.App.3d at p. 1053.)

"From this evidence the trier of fact was entitled to find that Antonovich's 'inaction was a product of *a deliberate decision not to acquire knowledge of facts* that might confirm the probable falsity of [the subject] charges,' which amounts to a '*purposeful avoidance of the truth*' and will support a finding of actual malice. (*Harte-Hanks*, [*supra*,] 491 U.S. 657, 692.)"  (*Antonovich, supra*, 234 Cal.App.3d at p. 1053, italics added.)

*Harte-Hanks*, *Khawar*, and *Antonovich* govern this suit.

Major factual distinctions are possible between this suit and these three authorities.  Central among them is the contrast between, on the one hand, the prestige and reliability of the federal district court decision on which Waters relied and, on the other hand, what Waters charged was Collins's lack of veracity and "dishonorable character."  So too could Waters's phone call to Collins's opposing counsel, as well as Collins's statement about

16

upgrading his discharge status, count as distinguishing positives for Waters. It is entirely possible that the trier of fact, later in this proceeding, will view all factors in Waters's favor and fully accept her professed sincerity. Thus a jury might find against Collins, with his $100 billion birth certificate and so forth.

Or the trier of fact may question why Waters would call the Navy's attorney simply to have him read an opinion she already had, and why she would refrain from asking that attorney for his personal knowledge about Collins's discharge status.

A further distinction between *Harte-Hanks*, *Khawar*, and *Antonovich* and this suit is the ease of internet research, which can yield information with a few strokes. A jury might find this distinction cuts in Collins's favor.

At this early stage of the case and without weighing the conflicting evidence, Collins established his case has at least minimal merit.

Collins showed Waters an official-looking document that, if authentic, completely pierced through to absolute truth, whatever Collins's foibles might have been, no matter the federal court opinion, and irrespective of other information.

Waters does not dispute this kind of document—the DD-214—is an authoritative source of discharge information. If authentic, it would prove Waters's accusation was totally false. The definitive quality of this proof magnified the risk of ignoring it.

Waters has not critiqued this document's appearance. It looks to be genuine in every respect. Indeed, as noted above, the form had negative information about Collins: it stated Collins's "NARRATIVE REASON FOR SEPARATION" was

17

"MISCONDUCT (SERIOUS OFFENSE)."  If Collins fabricated a document to make himself look good, this entry is puzzling.

Perhaps the document was a total fake.  These days, anyone with skills can alter documents or create them from scratch on a laptop at home.  At oral argument, Waters rightly emphasized that software is making it ever easier to concoct screen images that look genuine but are not.

But official documents can be checked officially.  It could only have been to Waters's electoral advantage to expose Collins's fabrication, if fabrication it truly was.  And the official check was easy to do.  That fact—that it would have been *easy* to check—is in the record and is undisputed.

Waters did not check.  Her briefing to us states that, to this day, she still has not checked.

A fact finder could conclude Waters was like Journal News, Globe, and Antonovich:  do not ask if you are committed to the project and would rather not know.  After they are told that potentially devastating information is easily available, decisionmakers who opt for ignorance instead of ready truth can be willfully blind.  If fact finders drew this inference, Collins's proof could constitute clear and convincing evidence of actual malice.  Reasonable minds could agree that people *purposefully* ignorant about the truth can have a high degree of awareness of probable falsity of a claim they deliberately avoid checking.  At this preliminary stage of the case, then, Waters has not defeated Collins's suit as a matter of law.  (See *Monster*, *supra*, 7 Cal.5th at p. 788 [court evaluates the defendant's showing to determine if it defeats the plaintiff's claim as a matter of law].)

Waters faults Collins for not filing a supplemental complaint but cites no authority for the relevance of this point to

a special motion to strike.  Collins at trial could move to conform his pleading to proof.  The absence of a supplemental pleading does not detract from Collins's showing of minimal merit.

Because it was a mistake to grant the special motion to strike on this record, we also vacate the trial court's award of attorney fees to Waters.

## DISPOSITION

We reverse the order granting the special motion to strike, vacate the trial court's fee award, and remand for further proceedings.  We award costs to Collins.


WILEY, J.


We concur:


GRIMES, Acting P. J.


VIRAMONTES, J.


19