Filed 6/4/24  Milo v. Hardin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| SAMANTHA MILO,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KRISTIN HARDIN,<br><br>Defendant and Appellant. | C097762<br><br>(Super. Ct. No. S-CV-0048580) |

This appeal challenges the trial court's denial of a special motion to strike pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute,[1] directed at a complaint filed by plaintiff Samantha Milo, asserting a single cause of action for defamation against defendant Kristin Hardin.  We affirm.

---

[1]  SLAPP is an acronym for strategic lawsuit against public participation.

 Further undesignated statutory references are to the Code of Civil Procedure.

1

## FACTS AND PROCEEDINGS

On June 8, 2022, Milo filed a civil complaint alleging a single cause of action for defamation against Hardin, seeking compensatory and punitive damages. In August 2022, Hardin filed an anti-SLAPP motion directed at Milo's complaint and a motion to strike punitive damages. The anti-SLAPP motion argued that Milo's defamation claim was based on acts in furtherance of Hardin's right to free speech, and Milo could not meet her burden to establish a probability of success on the merits. The motions were heard on November 29, 2022. The trial court issued written orders denying the motions; Hardin appeals from the order denying her anti-SLAPP motion.

*Milo's Allegations and Supporting Evidence*

According to Milo's sworn declaration, she was a certified horse trainer and judge, and was the owner and operator of Cavallo Stables, LLC, a horse training and exhibiting stable in Placer County.[2] Her stable "has numerous Medal Final wins, Hunter Derby wins, and Year-End Championships and has enjoyed an excellent reputation in the horse training and exhibiting community throughout California and the United States for 13 years" prior to February and March 2022.

From February 7 through 11, 2022, Milo and her horse, Lulavani, attended the Western Regionals, an event at the Desert International Horse Park (Desert Horse Park) in Thermal, California. On February 15, 2022, Milo traveled with several of her horses (including Lulavani) to Rancho Murieta, California, to participate in another event known as the Northern Winter Classic. Milo was aware that at least five other trainers and 21 horses were present at both events.

---

[2] Hardin contends on appeal that Milo's declaration was not a sworn declaration because it was not signed under penalty of perjury. We address that argument in the Discussion, *post*.

After she arrived with her horses in Rancho Murieta, Milo read a Facebook post by Desert Horse Park reporting an outbreak of Equine Herpes Virus-1 (EHV-1). According to the California Department of Food and Agriculture (Department), EHV-1 is a highly contagious "virus that is ubiquitous in the environment and found in most horses all over the world." EHV-1 infection can cause "respiratory disease, abortion in mares, neonatal foal death, and neurological disease." While "[h]orses are typically exposed to the virus at a young age with no serious side effects," "some horses develop the serious neurological form of the disease." Symptoms of the neurological form of the disease may include fever, incoordination, weakness, recumbency, and lethargy. The virus has an incubation period of two to 10 days, and respiratory shedding of the virus usually occurs for seven to 10 days. The virus is spread through direct horse-to-horse contact. Despite the risks associated with the disease, typically horses should only be tested for EHV-1 if they display clinical signs; because EHV-1 is endemic within the horse population, horses will likely test positive for the virus even when the presence of the virus does not pose a risk of transmission or infection.

On February 15, after reading Desert Horse Park's Facebook post, Milo informed Tim Postel, the manager of the Rancho Murieta event, that she had been at Desert Horse Park and had left that event on February 11. Postel did not request that she leave Rancho Murieta or quarantine her horses.

On February 20, Milo called the state veterinarian at the Department to discuss her horse's presence at Desert Horse Park. The veterinarian did not request that Milo leave Rancho Murieta or quarantine her horses.

On February 22, Milo spoke with Hardin at the Rancho Murieta event. Hardin is a horse rider and trainer who competes in many of the same events as Milo. Hardin expressed anger at a different trainer for bringing a horse to Rancho Murieta after the horse was at Desert Horse Park, but distinguished Milo's situation by stating, "well, you

3

only had one horse there, and you left on Friday." Hardin did not ask Milo to leave Rancho Murieta or quarantine her horse.

After 7:00 p.m. on February 24, Milo received an e-mail from the United States Equestrian Foundation (Foundation) mandating that horses that had been at Desert Horse Park within the previous two weeks, or horses that had been in contact with such horses, be isolated for at least 14 days from the date the horse left Desert Horse Park, subject to specified testing requirements. Horses that were at Desert Horse Park within 14 days preceding another competition were prohibited from entering a competition facility until they had complied with testing requirements. Noncompliance with the Foundation's protocols would result in penalties imposed on trainers.

On February 25, one of Milo's horses tested positive for EHV-1, although the horse was asymptomatic. Milo removed her horses from Rancho Murieta that day.

A Foundation official later confirmed that the Foundation did not impose a seven-day quarantine immediately following the Desert Horse Park event, and that it was "not processing any reports or complaints against [Milo] for violating a [Foundation] mandate related to the EHV-1 Outbreak."

On March 8, Hardin began publishing Facebook posts that Milo alleged contained false statements about Milo. The first post stated: "I found out how expensive tests are for the horses. I found out that to protect my herd at home, to have my horses tested negative twice, I have to pay . . . Not because one person was careless and not paying attention, but because somebody was blantant [*sic*], simply selfish and greedy. One act is a mistake and one is a choice. [¶] . . . [¶] [H]er bad choice remapped my life, and man . . . I hate that . . . The more I think about it the worse it gets. [¶] . . . [¶] She could have gone home– not tainted the show, exposed so many horses, risked the lives of so many horses . . . and she knew, she was told, and she was defiant. [¶] . . . [¶] I think she should offer to pay, the one who couldn't miss a show, the greedy one, the one who knew she was exposed but came anyway, the one who was asked to leave but wouldn't, the one

4

who defiantly posted a video about how her horse was immune (no horse is immune). [¶] But she hasn't offered, so I think I'll ask her to pay for our tests." That post was "liked" by 73 Facebook users, and there were 72 comments on the post.

Milo declared that she never posted a video stating that her horse was immune to EHV-1 or that her horse was not exposed at Desert Horse Park.

On March 12, Hardin published another Facebook post, which stated in part: "Day 28 [¶] Quarantine day 16 [¶] . . . [¶] Keeping my horses safe in the future will be my mission. It's scary to find out I have subjected them to such high risk without knowing, just by being surrounded by trainers who partake in dangerous and careless behaviors, those practices can not only hurt their horses but mine and yours too. [¶] Today, after I hopefully arrive home safely, I will be calculating my quarantine costs. [¶] . . . [¶] I will be sending this invoice of my costs to the person who knowingly ignored her advised week quarantine and defiantly brought her horse to the show, was encouraged to leave and refused, and subsequently tested positive, and ultimately shut down this series and helped to stop the state. [¶] I feel strongly about this, especially after hearing this isn't her first time breaking a medical quarantine protocol. [¶] I have come to understand that six or so years ago she attempted to dodge a positive strangles diagnosis, claiming her horse was again somehow unable to become ill from the disease that can kill any horse, her's [*sic*] tested positive and she went to the show anyway. [¶] From what I discovered, investigating that incident, her own client called the show to warm [*sic*] them of the situation, and she was confronted and asked to remove her horses. [¶] . . . [¶] So, because of that, I'm going to ask her to be accountable. Maybe then she will understand that her horse is not the only horse on the planet, and her horse is not the only horse at the Horse show. [¶] And, while we were under quarantine, she and her assistant were posting videos of all the great lessons they were giving at their home stable . . . well, we weren't giving lessons, These last two weeks . . . we were hoping our horses weren't going to come down with an illness that could kill them, because they had been exposed

5

to her horse . . . we have been on pins and needles, we have cried, we have studied and we have learned. [¶] . . . [¶] It's good we know who to watch out for now, but we shouldn't have to."

Milo declared that on March 17, Hardin published a Facebook post that included additional false statements about her violating quarantine. She cited to her complaint, which alleged that the post stated: "Disregarding mandatory protocols put in place by [the Foundation], which included a mandatory one week quarantine of all horses exposed at Desert Horse Park the week ending 2/13/2022, prior to attending another horse show following the direct exposure to the potentially deadly highly contagious, virus at Desert Horse Park IV (the week ending in 2/13/2022). [¶] Sami Milo ignored all safety protocols and chose to bring her exposed horse to [Rancho Murieta] to compete the week of beginning 2/16/2022, thereby risking exposing every horse on the property at [Rancho Murieta]. [¶] Further, Sami Milo refused to remove her exposed horse from [Rancho Murieta] and defended her choice not to by defiantly posting a video stating her horse was not exposed at Desert Horse Park (all data was available to prove otherwise). [¶] We were talking, both nervous and panicked to be honest, and sharing the information, my friend who called said she saw this particular horse with this particular person on it in the warm up area at our show and she said to her 'that's not quarantining!' then the rider of the horse said 'Oh she's fine, I'm going back to [Desert Horse Park] after this, it'll be OK it's not a big deal'. So she did know, but she didn't respect, and she didn't care about her horse, or our horses, and potentially about the horse that passed away yesterday."

Also on March 17, Hardin sent Milo a written invoice and request for reimbursement of expenses due to forced quarantine, which asserted that Milo owed Hardin more than $14,000. The invoice asserted that the expenses were incurred "directly relating to the exposure of a horse owned by and shown at the Northern Winter Classic 1 and 2 by Sami Milo."

6

On March 18, Hardin commented "I agree with you" on a Facebook post published by another trainer. That post stated in part: "Sami Milo . . . KNOWINGLY took horses from Thermal [Desert Horse Park] to other shows after attending Thermal and KNOWING about the virus and the risks involved."

Milo read the Facebook posts, and several of her clients, friends, and acquaintances contacted her to inform her of Hardin's statements about her. Following Hardin's posts, Milo received hurtful and damaging messages.[3] She also received a demand for money and a threat of legal action if she refused to pay. She asserted that the many comments on Hardin's posts demonstrated she had lost the respect of the horse training community. Further, two of her former clients who had interacted with Hardin's posts terminated their relationship with Milo soon after Hardin published her posts, as did a friend of one of the former clients.

Milo acknowledged that Hardin's March 8 and 12 posts did not refer to her expressly, but she stated that the posts "were so specific in their description of me and of the events that persons who were in the horse training and exhibiting community would and did understand that they referred to me specifically."

Milo declared that she believed Hardin "holds malice toward" her on the basis that they were direct competitors, Hardin sought financial gain from the outbreak, Hardin spread rumors about other trainers spreading the disease, Hardin singled out Milo despite numerous other trainers attending both events, and Hardin made false statements about her.

In opposition to Hardin's anti-SLAPP motion, Milo argued that Hardin's statements were libelous on their face because they were provably false; were of a nature that would naturally expose her to hatred, contempt, ridicule, or obloquy; and tended to

---

[3] Milo received one of these messages on February 27, before Hardin's first post.

7

injure her in her occupation. Milo's opposition further asserted that she was not a public figure and did not need to show actual malice, although she could demonstrate actual malice if necessary.

Hardin objected to the evidence Milo submitted in opposition, including to the admission of Milo's declaration because it was not signed under penalty of perjury. In response to Hardin's objection, Milo filed a supplemental declaration in which she declared under penalty of perjury that her prior declaration was true and correct and attached other exhibits. Hardin objected to that supplemental declaration as untimely and based on hearsay.

*Hardin's Arguments and Supporting Evidence*

Hardin's anti-SLAPP motion argued Milo could not meet her burden of establishing probability of success on the merits of her action because a portion of her alleged statements did not name Milo, and Milo could not show the falsity of two key facts upon which her claims were based: (1) at least one of Milo's horses was at Desert Horse Park during the week of February 13, 2022, and also at the Rancho Murieta event during the week of February 16, 2022; and (2) best event biosecurity practices provided that all horses participating in the Desert Horse Park show "were supposed to isolate/quarantine for one week." She further argued that Milo could not prove malice because Hardin's statements were largely true.

Hardin offered evidence that Milo rode Lulavani at Desert Horse Park during the week ending February 13, 2022, and also at the Rancho Murieta event between February 16 and 20. Hardin also offered evidence of an alert distributed by the Department on February 11, which confirmed that one horse had been diagnosed with an EHV-1 infection at Desert Horse Park, and two other horses in the same barn had been diagnosed with fever-only cases of EHV-1. The alert stated that the affected horses had been isolated and quarantined, and "[a]ll potentially exposed horses stabled in the tent barn where these cases were housed have been placed under quarantine." The

8

Department's alert recommended that all horses still at Desert Horse Park have their temperatures taken twice daily, and to immediately inform a veterinarian of any fevers or "neurological signs." The Department also "recommend[ed] any horses not under quarantine scheduled to leave [Desert Horse Park] keep these horses isolated from other horses and monitor temperatures twice daily for at least 7 days following their departure from the premises." Finally, the alert provided a "reminder of best event biosecurity practices"; namely, that "all horses returning from any equine event should be isolated 30 feet away from other horses for at least 7 days following the event."

*Trial Court Ruling*

In November 2022, the trial court overruled Hardin's objections to Milo's evidence and denied the anti-SLAPP motion and motion to strike punitive damages.

The trial court observed the parties' agreement that Hardin's posts arose from protected activity, and therefore it proceeded to the issue of whether Milo submitted sufficient prima facie evidence to support her defamation claim; it concluded she did. Regarding Hardin's argument that Milo was not named in the posts, the court pointed to Milo's evidence that Hardin had sent her a "quarantine bill" after posting on Facebook that she would be providing such a bill to the subject of her posts. Additionally, Hardin's posts as well as a text message exchange provided by Milo reasonably supported the inference that Milo was the person referenced in the posts.

Next, the trial court concluded Milo had presented evidence that Hardin's posts were false: Milo declared that she did not know about the Department's alert until after she arrived at the Rancho Murieta event, and that she promptly left that event upon receiving notice of the Foundation's formal quarantine and confirmatory positive testing of her horse for EHV-1. Finally, the court noted that Milo had demonstrated damages in the form of lost customers, threats, and receipt of quarantine bills.

The trial court observed that a defamation case involving a limited purpose public figure or a public issue requires the plaintiff to show actual malice through clear and

9

convincing evidence to defeat an anti-SLAPP motion,[4] and it treated Milo as having implicitly conceded that the defamation at issue in this case involved a public issue. It concluded Milo had satisfied her burden on the basis that Hardin had posted "heated, inflammatory statements about [Milo] on Facebook," which "were presented as if they were fact with no temperance of whether they were true or not." Additionally, Hardin "declared that she would be issuing a quarantine bill to plaintiff, which presented like a rallying cry for others to follow suit." Hardin had also deleted her posts, indicating that she understood the inflammatory nature of her statements and their questionable truthfulness.

Hardin timely appealed. The case was fully briefed in February 2024 and was assigned to the current panel at the end of that month.

## DISCUSSION

### I

### *Defamation Law*

" 'Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage.' " (*Sonoma Media Investments, LLC v. Superior Court* (2019) 34 Cal.App.5th 24, 37.) Defamation may occur by means of libel or slander. (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242; Civ. Code, § 44.) "Libel is a false and unprivileged publication by writing, . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) " 'A statement is defamatory when it tends "directly to injure [a person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those

---

[4] This conclusion was incorrect, as we explain in the Discussion, *post*.

10

respects which the office . . . peculiarly requires, or by imputing something with reference to his office . . . that has a natural tendency to lessen its profits." [Citation.] Statements that contain such a charge directly, and without the need for explanatory matter, are libelous per se. [Citation.] A statement can also be libelous per se if . . . a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter.' [Citation.] If the false statement is not libelous per se, a plaintiff must prove special damages." (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 675-676 (*Balla*).) Slander is oral defamation. (Civ. Code, § 46.)

To be defamatory, a statement must specifically refer to, or be "of and concerning," the plaintiff. (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042.) Additionally, "[a] statement is not defamatory unless it can reasonably be viewed as declaring or implying a provably false factual assertion [citation], and it is apparent from the 'context and tenor' of the statement 'that the [speaker] seriously is maintaining an assertion of actual fact.' " (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 344.) Typically, the defendant bears the burden to prove the truth of a statement alleged to be defamatory, but "where the communication involves a matter of public concern, the plaintiff does bear the burden of pleading and proving falsity." (*Industrial Waste & Debris Box Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1156.)

A plaintiff seeking compensatory damages in defamation actions typically needs to show only negligence. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742.) However, "public figure" plaintiffs must show that a " 'defamatory falsehood relating to his official conduct' " was made with actual malice. (*Khawar v. Globe Intern., Inc.* (1998) 19 Cal.4th 254, 262 (*Khawar*).) There are two types of public figures. "An 'all purpose' public figure has ' "achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." ' [Citation.] A ' "limited purpose" ' public figure is one who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of

11

issues." ' " (*Balla*, *supra*, 59 Cal.App.5th at p. 676.) "At trial, whether a plaintiff in a defamation action is a public figure is a question of law for the trial court. [Citations.] On appeal, the trial court's resolution of disputed factual questions bearing on the public figure determination is reviewed for substantial evidence, while the trial court's resolution of the ultimate question of public figure status is subject to independent review for legal error." (*Khawar*, *supra*, 19 Cal.4th at p. 264.) Additionally, a private figure plaintiff must prove actual malice if she seeks punitive damages in connection with a defamation claim involving a matter of public concern. (*Id.* at p. 274.) "In this context, actual malice means that the defamatory statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " (*Id.* at p. 275, quoting *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 280.)

II

*Anti-SLAPP Framework*

Section 425.16 provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Id.*, subd. (b)(1).) "In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (*Id.*, subd. (b)(2).) "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: . . . any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (*Id.*, subd. (e).) " 'We review de novo the grant or denial of an anti-SLAPP motion.' " (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*).)

12

"The purpose of anti-SLAPP motions is to weed out lawsuits designed to stifle free speech or lawful expressive conduct." (*Yeager v. Holt* (2018) 23 Cal.App.5th 450, 456.) Our Supreme Court has clarified the two-step process for litigating such a motion: "First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.) "The defendant has the burden on the first issue; the plaintiff has the burden on the second issue." (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1251.)

In the second step of the section 425.16 procedure, the plaintiff must "demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396.) However, the court " 'should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714.) The plaintiff's "burden on prong two is 'not high,' and we are required to 'accept as true all evidence favorable to' " Milo. (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 794 (*Edward*).)

"[T]he court may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater*, *supra*, 6 Cal.5th at p. 949.) At step two of the anti-SLAPP analysis, "the affidavit or declaration is offered to demonstrate that admissible evidence exists to prove plaintiff's claims. The statements must reflect that they were made by competent witnesses with personal knowledge of the facts they swear to be true." (*Id.*, at

13

pp. 944-945.)  "[T]he *written statements themselves* need not be admissible at trial, but it must be reasonably possible that the *facts asserted* in those statements can be established by admissible evidence at trial."  (*Id.* at p. 948, fn. 12.)  In other words, " 'the proper view of "admissible evidence" for purposes of the SLAPP statute is evidence which, by its nature, is capable of being admitted at trial, i.e., evidence which is competent, relevant, and not barred by a substantive rule.  Courts have thus excluded evidence which would be barred at trial by the hearsay rule, or because it is speculative, not based on personal knowledge or consists of impermissible opinion testimony.  This type of evidence cannot be used by the plaintiff to establish a probability of success on the merits because it could *never* be introduced at trial.' "  (*Id.* at p. 947.)

III

*Evidentiary Rulings*

Hardin contends the trial court improperly overruled her objections to Milo's declarations, which were based on the fact that Milo did not declare under penalty of perjury that the contents of the declarations were true (see § 2015.5 [declarant must certify the written declaration to be true under penalty of perjury]), and that Milo's supplemental declaration was untimely (see § 1005, subd. (b) [all papers opposing a motion shall be filed with the court and served on each party at least nine court days before the hearing]).

We review the trial court's evidentiary rulings for abuse of discretion.  (*Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1021; *Sanchez v. Bezos* (2022) 80 Cal.App.5th 750, 763; *Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 606; *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444.)  We conclude the trial court did not abuse its discretion when it overruled Hardin's objections.

A.  *Procedural History*

On September 15, 2022, Milo filed her initial declaration in opposition to Hardin's anti-SLAPP motion.  Near the end of that declaration, Milo declared:  "I have personal

14

knowledge of the foregoing and can competently testify to the same in a Court of law. [¶] I declare under penalty of perjury that this Declaration was executed this 14th Day of September 2022, at Newcastle, California." Hardin objected to the entirety of Milo's declaration on the basis that the statements contained therein were not made under oath.

The hearing on the motion was noticed for September 29, 2022, and the matter was fully briefed on September 21, 2022. On September 29, the trial court continued the hearing sua sponte.

On October 10, 2022, Milo filed a supplemental declaration in opposition to Hardin's reply brief, in which she declared that she "ha[s] read the Declaration of Samantha Milo in Opposition that was filed with this Court on September 15, 2022, and know[s] the contents thereof. I declare under penalty of perjury that the Declaration is true and correct." She also declared: "I have read this Supplemental Declaration and know the contents thereof. I declare under penalty of perjury that this Declaration is true and correct. This Declaration is true and correct of my own personal knowledge and I can competently testify to the same in a Court of law. [¶] I declare under penalty of perjury that this Declaration is executed this 7th Day of October 2022, at Newcastle, California." Hardin again objected to the declaration as untimely and not properly authenticated because it declared under penalty of perjury only that the declarations, not the contents thereof, were true and correct.

The trial court overruled Hardin's objections to the declarations without providing its reasoning.

B. *Analysis*

Hardin argues that Milo's initial and supplemental declarations were deficient because the initial declaration certified under penalty of perjury only the truth of the date and location she executed the declaration, and the supplemental declaration only declared under penalty of perjury that the *declarations* were true, not the *contents* of the statements contained within the declarations.

15

In relevant part, section 2015.5 permits submission of the "unsworn statement, declaration, verification, or certificate, in writing of such person which recites that it is certified or declared by him or her to be true under penalty of perjury, is subscribed by him or her, and . . . , if executed within this state, states the date and place of execution . . . ." Additionally, the statute provides, "The certification or declaration may be in *substantially* the following form: [¶] . . . [¶] 'I certify (or declare) under penalty of perjury that the foregoing is true and correct.' " (Italics added.)

We agree with Hardin that Milo's initial declaration did not adequately certify its truth under penalty of perjury. That declaration narrowly declared under penalty of perjury only "that this Declaration was executed this 14th Day of September 2022, at Newcastle, California." That certification did not encompass the remainder of the statements contained within the declaration.

However, we conclude Milo's supplemental declaration cured the defects of the initial declaration. The supplemental declaration certified that Milo had read the initial declaration, knew of its contents, and "declare[s] under penalty of perjury that the Declaration is true and correct." The supplemental declaration also declared that the initial declaration "is true and correct of my own personal knowledge."

Hardin argues that the supplemental declaration only managed to certify under penalty of perjury that the initial declaration *existed*, not that the statements made in the declaration were true. We disagree. Section 2015.5 supports the certification of the declaration, as opposed to its contents, as true and correct. The statute provides that any matter required or permitted to be supported, evidenced, established, or proved by a sworn statement may be done so through an unsworn declaration "in writing of such person which recites that *it* [the declaration] is certified or declared by him or her to be true under penalty of perjury . . . ." (Italics added.) In other words, it is the unsworn declaration that must be declared by the declarant to be true under the penalty of perjury. (See *Sweetwater*, *supra*, 6 Cal.5th at p. 941 ["To qualify as an alternative to an affidavit,

16

a declaration must be signed and recite that the person making it certifies *it* to be true under penalty of perjury" (italics added)]; *Sanchez v. Bezos*, *supra*, 80 Cal.App.5th at p. 763, fn. 3 [quoting *Sweetwater*].)

We recognize that section 2015.5 provides that "[t]he certification may be in *substantially* the following form:  [¶]  . . .  [¶]  'I certify (or declare) under penalty of perjury that the foregoing is true and correct.' "  (Italics added.)  However, we conclude that Milo's declaration *substantially* complied with the form provided by the statute, although she declared that the entirety of the declaration, and not specifically the statements made within the declaration, were true.  (*People v. Pierce* (1967) 66 Cal.2d 53, 58-59 [§ 2015.5 satisfied even though declaration differed in format from exemplar]; *Hirschman v. Saxon* (1966) 246 Cal.App.2d 589, 593 [same)]])  Milo's supplemental declaration certified that she had read her initial declaration, knew its contents, and declared under penalty of perjury that the declaration was true and correct.  The supplemental declaration was sufficient to cure the defect in the initial declaration.

Hardin further argues that the supplemental declaration was filed without seeking leave of court and was untimely.  We recognize that Milo's supplemental declaration was not filed "at least nine court days" before the hearing, and therefore did not comply with section 1005, subdivision (b).  However, the trial court had broad discretion to accept late-filed documents.  (*Haydon v. Elegance at Dublin* (2023) 97 Cal.App.5th 1280, 1289; *Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 261-262 [court has discretion to decide whether to consider an untimely brief in reaching its decision].)  Hardin contends that Milo "should not be rewarded for taking advantage of the court's last-minute *sua sponte* continuance that occurred *on the date of the noticed hearing*."  Although Hardin may not *agree* with the court's decision to consider the supplemental declaration, she fails to show that the decision constituted an abuse of its broad discretion, especially considering that she was provided with the full and fair opportunity to respond to Milo's evidence and did respond.  (See *Cornerstone*

*Realty Advisors, LLC v Summit Healthcare REIT, Inc.* (2020) 56 Cal.App.5th 771, 804 ["A trial court has inherent power to exercise its discretion to control the proceedings before it, and this power includes the authority to receive supplemental or additional declarations for the court's guidance and decision"].)[5]

Hardin has failed to demonstrate that the trial court abused its discretion by overruling her objections to the evidence Milo submitted in opposition to her motion.[6]

IV

*Probability Milo Will Prevail on the Merits*

Hardin contends her anti-SLAPP motion should have been granted on the merits because her allegedly defamatory statements arose from the protected activity of free speech, Milo's opposition to the motion failed to demonstrate a probability of prevailing on the defamation claim, and there is no evidence that she acted with actual malice.

Milo conceded for purposes of the anti-SLAPP analysis that Hardin's Facebook posts were written statements made in a public forum in connection with an issue of public interest, and therefore arose from the protected activity of free speech. (See § 425.16, subd. (e)(3).) Accordingly, the issue before us is whether Milo satisfied her burden of showing that her defamation claim "has 'at least "minimal merit." ' " (*Bonni v. St. Joseph Health System*, *supra*, 11 Cal.5th at p. 1009.)

---

[5] Hardin briefly mentions in a separate part of her brief that the court abused its discretion by overruling her hearsay objections to Milo's evidence related to her March 17 post. We will discuss that argument in greater detail, *post*.

[6] During oral argument, Hardin argued that some of her evidentiary arguments had merit, and the trial court erred by not individually ruling on each objection. But in the absence of any individualized argument as to specific objections, aside from the objections addressed in this opinion, she has failed to demonstrate an abuse of discretion.

The parties disagree on whether Milo has established a probability of prevailing on three elements of her defamation claim:  provably false assertions of fact, falsity, and malice.

A.  *Evidence that the Posts were About Milo*

Hardin initially argues that her March 8 and 12 posts did not refer to Milo by name, and therefore Milo cannot satisfy her burden to show that the posts defamed her.

We disagree and conclude that the submitted evidence sufficiently linked the posts to Milo (*Carlisle v. Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 741 [defamatory publication need not reference the plaintiff if the defamatory meaning attached to him; reference may be indirect, and it is not necessary that every listener understand it so long as there are some who reasonably do]) such that the posts are "of or concerning" her (*Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at p. 1042).  Hardin's March 8 post discussed "how expensive [EHV-1] tests are for horses," that "I think she should offer to pay," but that "she hasn't offered, so I think I'll ask her to pay for our tests."  The post stated that the subject of the post "could have gone home– not tainted the show, exposed so many horses . . . and she knew, she was told, and she was defiant." The post alleged that its subject "knew she was exposed but came anyway," "was asked to leave but wouldn't," and "posted a video about how her horse was immune."

In the March 12 post, Hardin stated that she would be "calculating [her] quarantine costs," and would be "sending this invoice of my costs to the person who knowingly ignored her advised week of quarantine and defiantly brought her horse to the show, was encouraged to leave and refused, and subsequently tested positive, and ultimately shut down this series and helped to stop the state."

On March 17, Hardin sent Milo a written invoice and request for reimbursement of expenses due to forced quarantine; the request included many of the same allegations from the March 8 and 12 posts.  The invoice asserted that Milo "ignored all safety protocols and chose to bring her exposed horse to [Rancho Murieta] . . . , thereby risking

19

exposing every horse on the property at [Rancho Murieta]." The invoice also stated that Milo "refused to remove her exposed horse from [Rancho Murieta] and defended her choice not to by defiantly posting a video stating her horse was not exposed at Desert Horse Park."

Additionally, Hardin commented "I agree with you" on another trainer's Facebook post on March 18 stating that Milo "KNOWINGLY took horses from Thermal to other shows after attending Thermal and KNOWING about the virus and the risks involved." Milo also provided evidence that several of her clients, friends, and acquaintances contacted her about the statements in Hardin's posts, and at least three clients terminated their relationships with Milo soon after the posts.

Combined, the evidence sufficiently demonstrated that Hardin's posts referred to Milo.

B. *Hardin's March 8 Post*

Hardin's March 8 Facebook post stated that Milo "could have gone home– not tainted the show, exposed so many horses, risked the lives of so many horses . . . and she knew, she was told, and she was defiant." The post continued to state that Milo "knew she was exposed but came anyway," "was asked to leave but wouldn't," and "posted a video about how her horse was immune." A reasonable person reading Hardin's post in context would conclude that Hardin made the following factual assertions: (1) Milo knew her horse was exposed to EHV-1 *before* she arrived in Rancho Murieta for the event; (2) Milo was asked to leave Rancho Murieta; (3) Milo defiantly refused to leave the show despite being asked to do so; and (4) Milo posted a video about how her horse was immune from EHV-1.

Milo presented prima facie evidence showing a probability of success on the merits of her defamation claim as to these statements. Milo declared that she learned about the EHV-1 outbreak only after she arrived in Rancho Murieta. Even if we assume that Milo read the Department's February 11 alert, that alert informed her that "[a]ll

potentially exposed horses stabled in the tent barn where [the confirmed cases of EHV-1 infection] were housed have been placed under quarantine." Thus, her evidence demonstrated that she was not aware her horse had been exposed to EHV-1 before arriving at the Rancho Murieta event.

Milo also declared that she was not asked to leave Rancho Murieta until she received the Foundation's formal quarantine notice on February 24, at which time she promptly left Rancho Murieta. She declared that upon learning about the outbreak at Desert Horse Park, she told the manager of the Rancho Murieta event that she was at Desert Horse Park and had left that facility on February 11; the manager did not ask her to leave Rancho Murieta or quarantine her horses. Milo then spoke with the state veterinarian from the Department to discuss her horse having been at Desert Horse Park, and the veterinarian also did not ask her to leave the Rancho Murieta event. Additionally, Milo had a conversation with Hardin on February 22, and Hardin did not ask her to leave the Rancho Murieta event or quarantine her horses. When Milo learned about a mandate from the Foundation that she quarantine her horses on February 24 at around 7:00 p.m., she tested her horses on February 25 and left the facility that same day. Further, the Foundation confirmed that it was not processing any complaints against her for violating the quarantine mandate. Finally, Milo declared that she never posted a video that her horse was immune.

Hardin responds that Milo continued to compete in the Rancho Murieta event despite knowing that her horse had been exposed to EHV-1 at Desert Horse Park. But Hardin's allegedly false statement was not that Milo knew about the outbreak on February 15 and competed thereafter. Rather, Hardin asserted that Milo knew that her horse was exposed to EHV-1 before coming to Rancho Murieta, and she came anyway. Milo's evidence demonstrates that she did not know about the outbreak *before arriving* in Rancho Murieta. Further, the Department's alert on February 11 expressly stated that "[a]ll potentially exposed horses stabled in the tent barn where [the confirmed cases of

21

EHV-1 infection] were housed have been placed under quarantine." There is nothing in the record to suggest that Lulavani was among the horses that were exposed and quarantined at the time of the alert.

Second, Hardin contends that her statement that Milo "was asked to leave but wouldn't" is too amorphous to constitute a defamatory fact. In determining whether a statement is false for purposes of a defamation action, "[t]he 'pertinent question' is whether a 'reasonable fact finder' could conclude that the statements 'as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure' plaintiff's reputation." (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 703.) "We apply a ' "totality of the circumstances" ' test to determine whether a statement is fact or opinion, and whether a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made." (*Ibid.*) Under this test, " ' "[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered." ' [Citation.] Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." (*Ibid.*) " '[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance.' " (*Id.* at p. 702.) Considering the context of Hardin's post, a reasonable fact finder would understand Hardin's statement to assert that a person at the Rancho Murieta event asked Milo to leave the event, and that Milo refused to do so.

Third, Hardin contends that even if her statement that Milo "was asked to leave but wouldn't" is properly construed as a fact, the request to leave was conveyed to Milo through the Department's February 11 alert, which recommended that horses who were present at Desert Horse Park isolate for seven days. But this evidence does not defeat

22

Milo's claim as a matter of law. As we have discussed, the Department's alert indicated that "all potentially exposed horses" had been placed under quarantine; Lulavani was not quarantined. The alert "recommended any horses not under quarantine scheduled to leave the horse park keep these horses isolated from other horses and monitor temperatures twice daily for at least 7 days following their departure from the premises." This general recommendation based on best practices is different from an assertion that Milo was *asked* to leave Rancho Murieta, which implies a direct request to her was made. Further, Milo declared that she spoke to not only the manager of the Rancho Murieta event, but also to the state veterinarian employed by the Department that issued the alert, and neither asked her to leave the Rancho Murieta event. In other words, even if the Department's alert could be construed as a general request to isolate, Milo sought clarification of that directive and was told she did not need to leave the event.

Fourth, Hardin argues Milo's declaration was silent on whether she isolated her horse immediately upon receiving the Foundation's mandated quarantine on February 24, and therefore Milo cannot demonstrate the falsity of her statement that Milo "was asked to leave but wouldn't." We disagree. Milo declared that at no time did she refuse to leave when asked. She also declared that she became aware of the Foundation's quarantine mandate via e-mail after 7:00 p.m. on February 24, 2022, tested her horses on February 25, and left that same day. She offered evidence that the Foundation confirmed that there had been no reports or complaints of her violating the mandatory quarantine. Milo's evidence sufficiently demonstrates that she complied with the Foundation's quarantine mandate.

Fifth, Hardin argues that her statement that Milo "defiantly posted a video about how her horse was immune (no horse is immune)" cannot be proven false because the statement was too vague and ambiguous to constitute an assertion of fact and was instead an expression of opinion or hyperbole. We disagree. A reasonable person reading that

23

statement would conclude that Hardin was asserting as fact that Milo posted a video stating that her horse was immune from EHV-1.

Milo presented sufficient evidence to demonstrate a probability of success on the merits, and Hardin's evidence does not eliminate, as a matter of law, Milo's ability to show that Hardin's March 8 post included provably false assertions of fact.

C. *Hardin's March 12 Post*

Hardin's March 12 post stated that Milo (1) "knowingly ignored her advised week quarantine and defiantly brought her horse to the show," and (2) "was encouraged to leave but refused."

Hardin reiterates her argument that the Department's February 11 alert recommended a seven-day isolation period for horses that had been at Desert Horse Park at the time of the outbreak. But as we discussed *ante*, Milo presented sufficient evidence to demonstrate that she learned about the outbreak only after she arrived at the Rancho Murieta event and, upon learning about the EHV-1 outbreak, Milo discussed her situation with the show's manager and the state veterinarian, neither of whom asked her to leave the event. In other words, Milo's evidence demonstrates that she was *not* "encouraged to leave but refused," but rather that she sought out the relevant authorities, and none encouraged her to leave the event.

Hardin also argues that it is sufficient if the substance of the charge is proven true, irrespective of slight inaccuracy in the details, " 'so long as the imputation is substantially true so as to justify the "gist or sting" of the remark.' " (*Ringler Associates*, *supra*, 80 Cal.App.4th at p. 1181.) But here, the "gist or sting" of Hardin's statements was that Milo knew about a recommended quarantine, knowingly ignored the quarantine, and refused to leave even when encouraged to do so. Milo's evidence sufficiently demonstrated that the "gist or sting" of Hardin's comments was false.

Hardin's post included other allegedly false statements. As an example, the post stated: "I feel strongly about this, especially after hearing this isn't her first time

24

breaking a medical quarantine protocol. [¶] I have come to understand that six or so years ago she attempted to dodge a positive strangles diagnosis, claiming her horse was again somehow unable to become ill from the disease that can kill any horse, her's [*sic*] tested positive and she went to the show anyway." Milo presented evidence that she "never tried to 'dodge a positive Strangles diagnosis' or claim [her] horse couldn't become ill." She declared that one of her horses once tested positive for strangles, and she immediately took the horse home.

Hardin argues that the statement cannot constitute an assertion of fact because the sentence is her interpretation of hearsay evidence. But "[a] false statement is not less libelous because it is the repetition of rumor or gossip or of statements or allegations that others have made concerning the matter." (*Ray v. Citizen-News Co.* (1936) 14 Cal.App.2d 6, 8-9; see *Jackson v. Paramount Pictures Corp.* (1998) 68 Cal.App.4th 10, 26-27 [when a party repeats a slanderous charge, he is equally guilty of defamation, even though he states the source of the charge and indicates that he is merely repeating a rumor].)

Finally, Hardin stated in her post: "while we were under quarantine, [Milo] and her assistant were posting videos of all the great lessons they were giving at their home stable." Hardin contends this statement does not specify that the quarantine referred to in the post refers to the 2022 EHV-1 quarantine. But the context of the post makes clear that the statement refers to the quarantine related to the EHV-1 outbreak at issue here. Hardin began her post with the statement: "Day 28 [¶] Quarantine day 16," indicating that she was under quarantine at the time of her post. Additionally, the rest of the sentence states: "well, we weren't giving lessons, These last two weeks . . . we were hoping our horses weren't going to come down with an illness that could kill them, because they had been exposed to her horse . . . we have been on pins and needles, we have cried, we have studied and we have learned." These statements were clearly intended to juxtapose her conduct while quarantining with Milo's conduct.

Milo offered evidence that her assistant posted one video of a client on a lesson horse, but "that occurred" after the quarantine had been released. Milo's declaration is ambiguous as to whether the lesson was given after quarantine had been released, or whether the video was posted after quarantine had been released. In any event, the "gist or sting" of Hardin's statement is that, while under quarantine, Milo and her assistant posted videos of the lessons they were giving. Milo has presented evidence that this statement is false.

D. *March 17 Post*

Milo's complaint alleged that Hardin made additional false statements on March 17, 2022. In support of her opposition to Hardin's anti-SLAPP motion, Milo declared that the March 17 statements were posted on Facebook and were false because she had "never disregarded '[Foundation] Mandatory Protocols.' " She noted there was only one mandate, which was issued on February 24, 2022.

Hardin observes that Milo did not produce an authenticated version of the March 17 post, and she contends quoting the post in the complaint was not sufficient to overcome Hardin's hearsay objection. But as we have discussed, a declaration in opposition to an anti-SLAPP motion "is offered to demonstrate that admissible evidence exists to prove plaintiff's claims"; "the *written statements themselves* need not be admissible at trial, but it must be reasonably possible that the *facts asserted* in those statements can be established by admissible evidence at trial." (*Sweetwater*, *supra*, 6 Cal.5th at p. 948, fn. 12.) In other words, it only needs to be reasonably possible that the facts asserted in the declaration--that Hardin made the statements in the March 17 post and that those statements were false--can be established by admissible evidence at trial. That standard is satisfied here because it is reasonably possible that Milo could produce an authenticated copy of Hardin's March 17 post at trial.

Hardin also argues that the statement in her March 17 post was true because Milo disregarded the Department's recommended seven-day isolation period and presented no

26

evidence that she isolated her horses in compliance with the Foundation's mandate. We disagree. First, as Hardin concedes, the Department's February 11 alert regarding the outbreak included a *recommended* isolation period rather than a *mandated isolation* period. Second, Milo's evidence demonstrated that she learned of the Foundation's mandated isolation period on the evening of February 24, and tested her horses and left Rancho Murieta on February 25. Additionally, there had been no reports or complaints against her for violating the Foundation's mandate related to the outbreak. Milo presented sufficient evidence that Hardin's March 17 post included provably false statements.

E. *Defamatory*

If the various statements at issue here are false, they are libelous. As Hardin recognizes: "For those involved in the multi-billion dollar equine industry, horses are not only a passion but *their livelihood*." Her briefing acknowledges that, "if there is any indication that someone may be recklessly endangering these animals (a professional horsewoman no less), it is of utmost concern for countless people involved in the industry, and it should not be a shock to plaintiff that some, including defendant Hardin, chose to speak out regarding certain individuals' disregard for the safety and wellbeing of these valuable and beloved assets (the horses)."

Hardin's Facebook posts asserted that Milo knew her horse had been exposed to a deadly virus before leaving Desert Horse Park, and then knowingly, intentionally, and defiantly exposed numerous horses to the virus at the Rancho Murieta event even after she was asked to leave the event. Hardin further asserted that Milo proceeded to post a video about how her horse was immune from the virus to which she had just exposed many horses. Combined, Hardin's statements would have "a tendency to injure [her] in [her] profession" as a horse trainer (Civ. Code, §§ 44, 45, 45a) because they paint her as a callous person recklessly exposing horses to a deadly disease without considering the health or wellbeing of her horses or that of horses belonging to other trainers.

27

Because Milo presented sufficient evidence to support the finding that Hardin's posts had the natural tendency to injure her in her profession, we need not and do not analyze whether Milo also presented evidence of special damages.

F. *Actual Malice*

Milo is seeking both compensatory and punitive damages. Her request for punitive damages requires her to prove actual malice regardless of whether she is a private or public figure, provided the defamation involves a matter of public concern. (*Khawar*, *supra*, 19 Cal.4th at p. 274.) In addition, Hardin argues that Milo is a public figure, which would require her to prove malice as an essential element of her claim.

The trial court did not decide whether Milo was a limited purpose public figure. (See § 425.16, subd. (b)(3); *Mosesian v. McClatchy Newspapers* (1991) 233 Cal.App.3d 1685, 1694 ["Whether a plaintiff is a public official or public figure is in the first instance a question of law for the trial court to decide"].) Instead, the court incorrectly concluded that the law required a plaintiff to prove actual malice in cases involving a limited public purpose figure *or* a public issue. Observing that the case involved a public issue, the court reached the issue of whether Milo had demonstrated sufficient evidence of actual malice to defeat the anti-SLAPP motion, and it concluded she had. Because the court concluded that Milo showed sufficient evidence of malice in any event, the court's error in failing to determine whether Milo was a limited purpose public figure was not prejudicial unless the evidence negated malice as a matter of law.

At trial on a defamation claim, a plaintiff must prove actual malice by clear and convincing evidence, which requires her to prove that the statement was made " 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " (*Khawar*, *supra*, 19 Cal.4th at p. 275, quoting *New York Times Co. v. Sullivan*, *supra*, 376 U.S. at p. 280.) " 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth,' " and the evidence must be clear and convincing. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244,

252, 256.) " 'The burden of proof by clear and convincing evidence "requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84.)

However, a plaintiff opposing an anti-SLAPP motion does not need to prove actual malice by clear and convincing evidence. Rather, a plaintiff "must meet their minimal burden by introducing sufficient facts to establish a prima facie case of actual malice. In other words, they must establish a reasonable probability they can produce clear and convincing evidence showing that the statements were made with actual malice." (*Collins v. Waters* (2023) 92 Cal.App.5th 70, 80.) As such, the burden is " 'not high.' " (*Edward*, *supra*, 72 Cal.App.5th at p. 794.)

"[A]ctual malice can be proved by circumstantial evidence. '[Evidence] of negligence, of motive and of intent may be adduced for the purposes of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.' " (*Reader's Digest Assn. v. Superior Court*, *supra*, 37 Cal.3d at p. 257.) "Considerations such as 'anger and hostility toward the plaintiff,' 'reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff,' and 'failure to investigate' may, 'in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' [Citation.] Such evidence is relevant 'to the extent that it reflects on the subjective attitude of the publisher,' and failure to investigate, without more, generally is insufficient." (*Balla*, *supra*, 59 Cal.App.5th at p. 683.)

Milo offered evidence sufficient to satisfy her minimal burden to establish a prima facie case of actual malice. (*Collins v. Waters*, *supra*, 92 Cal.App.5th at p. 80.) Her evidence shows that she and Hardin were direct competitors in the multi-billion dollar equestrian industry, and that Hardin's posts sought to juxtapose her conduct with that of Milo for purposes of harming Milo's standing within their shared industry. For example,

Hardin posted that she had been "hoping our horses weren't going to come down with an illness that could kill them, because they had been exposed to [Milo's] horse . . . we have been on pins and needles, we have cried, we have studied and we have learned." She noted that "[k]eeping my horses safe in the future will be my mission." Milo, Hardin asserted, "risked the lives of so many horses" because she was "blatant, simply selfish and greedy," and Hardin was "surrounded by trainers who partake in dangerous and careless behaviors." Hardin added: "It's good we know who to watch out for now, but we shouldn't have to." As we have discussed at length, Hardin's posts generally characterized Milo as a horse trainer who defiantly brought her horse to an event knowing that her horse had been exposed to a deadly virus, remained at the event despite being asked to leave, and posted videos stating her horse was immune from the disease. These statements undoubtedly expressed anger and hostility toward Milo.

Additionally, Hardin's posts singled out Milo. Milo presented evidence that multiple other trainers had brought their horses to both the events at Desert Horse Park and Rancho Murieta, yet Hardin wrote multiple Facebook posts about Milo and sent Milo an invoice for reimbursement of her quarantine costs, while also encouraging her social media contacts to do the same.

Finally, Milo has presented sufficient evidence demonstrating a probability that Hardin knew or should have known that her statements were false. For example, Milo presented evidence that she never posted videos stating that her horse was immune, and Hardin likely knew that her statements to the contrary were false. On March 17, Hardin posted that Milo had disregarded the Foundation's mandatory protocols, although she acknowledges on appeal that the Department's February 11 alert included a recommended isolation period, not a mandated quarantine. Hardin characterizes that misstatement as a "typographical error," but given the extreme focus Hardin appears to have paid to this issue in the communications at issue, she knew or should have known that her statement was false.

In sum, under the "low standard" applicable to the second step of an anti-SLAPP motion, we conclude Milo met her burden of showing the actual malice element for her defamation claim against Hardin had at least " 'minimal merit.' " (*Edward*, *supra*, 72 Cal.App.5th at p. 794.)  The actual merits of Milo's claims "must be resolved by the trier of fact." (*Ibid*.)[7]

## DISPOSITION

The order is affirmed.  Respondent shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)

/s/
Duarte, Acting P. J.

We concur:


/s/
Mesiwala, J.


/s/
Wiseman, J.[*]

---

[7]  Because we conclude Hardin's claims lack merit, we reject her argument that she is entitled to an award of her reasonable attorney's fees.

[*]  Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.